# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Weeks, 2011 IL App (1st) 100395**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT WEEKS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-10-0395 |
| Filed | September 27, 2011 |
| Rehearing denied | January 25, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for aggravated criminal sexual assault and attempted murder, the jury's finding that defendant was guilty but mentally ill was affirmed over defendant's contentions that he should have been found not guilty by reason of insanity or that he should have been granted a new trial because of the denial of his motion for a continuance, the ineffectiveness of defense counsel, and the denial of his motion for the appointment of a special prosecutor. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-22966; the Hon. Michael Brown, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal          Michael J. Pelletier, Alan D. Goldberg, and Kristine A. Neal, all of the State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Tasha-Marie Kelley, Assistant State's Attorneys, of counsel), for the People.

Panel          JUSTICE CONNORS delivered the judgment of the court, with opinion.

Presiding Justice Quinn and Justice Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1          A jury found defendant Robert Weeks guilty but mentally ill on three counts of aggravated criminal sexual assault and one count of attempted murder. On appeal, defendant contends that the jury's verdict was against the manifest weight of the evidence and that he should instead have been found not guilty by reason of insanity. Alternatively, defendant argues that a new trial is warranted because (1) the trial court abused its discretion in failing to grant a continuance, (2) his defense counsel was ineffective, and (3) the trial court erroneously denied a motion to appoint a special State's Attorney for this case. We affirm.

¶ 2                              I. BACKGROUND

¶ 3          The facts surrounding the offense were essentially undisputed, and the trial centered on the question of defendant's sanity. We begin by briefly summarizing the evidence presented at trial and this case's procedural history, and we will refer to additional facts as necessary in our analysis.

¶ 4          Defendant attacked and sexually assaulted the victim, E.L., in February 2001. As E.L. was walking home around 1:30 a.m., defendant knocked her down from behind and dragged her into an empty lot. E.L. attempted to scream for help, but defendant repeatedly ordered E.L. to be quiet and began striking her in the head and face with a large rock. Defendant struck E.L. with the rock on her head and back until she was subdued, then dragged E.L. to a gangway in the back of the lot. Defendant climbed on top of E.L., but was interrupted when a car drove through the alley. Defendant stopped what he was doing and ordered E.L. to be quiet. After the car passed, defendant dragged E.L. farther into the alley, sexually assaulted her, and fled. E.L. was eventually found by police officers who had been alerted to the assault by passersby.

¶ 5          E.L. was taken to a hospital and treated for her injuries. The injuries to E.L.'s face and

skull were severe and required the implantation of a metal plate under her eye. A sexual assault kit was also collected at the hospital, which recovered a male DNA sample from underneath E.L.'s fingernails. Defendant was eventually indicted several years later when the DNA sample was matched to him.

¶ 6 After defendant's indictment, the Office of the Cook County Public Defender was appointed as counsel, but the office was required to withdraw shortly thereafter due to a conflict of interest.[1] After the public defender withdrew, defendant's new private counsel gave notice that she intended to pursue an affirmative defense of insanity and moved to have defendant evaluated for fitness to stand trial.

¶ 7 The trial court conducted two fitness hearings. At the first hearing, the parties stipulated to the testimony of Dr. Peter Lourgos, a psychiatrist who was also the assistant director of Forensic Clinical Services for the Cook County court. According to Dr. Lourgos, defendant was fit to stand trial with medication. The trial court agreed and found defendant fit for trial. At the second hearing, Dr. Lourgos testified for the State and defendant presented the testimony of Dr. Michael Stone. Whereas Dr. Lourgos opined that defendant was fit for trial, as he had at the time of the first hearing, Dr. Stone opined that defendant was unfit for trial. Both experts substantially agreed that defendant suffered from one or more mental illnesses, but they differed as to whether he was able to stand trial with medication. The trial court ultimately found defendant fit for trial with medication.

¶ 8 About six months before the scheduled trial date, defense counsel filed an emergency motion to withdraw based on defendant's inappropriate behavior toward her during a meeting. The court granted the motion and reappointed the public defender, the earlier conflict of interest having apparently been resolved.

¶ 9 Only four days before the trial was set to begin, several developments occurred that are relevant to this appeal. On that date, which was a previously scheduled hearing on motions *in limine* for this case, defendant was arraigned on five new cases. These new charges stemmed from an incident several weeks before in which defendant allegedly threatened a number of individuals in the courtroom, one of whom was the lead prosecutor in this case. Also on that date, defense counsel requested that the trial date be rescheduled. According to defense counsel, she had realized only days before that Dr. Stone, who was scheduled to testify as the defense expert on the issue of insanity, had never rendered an opinion as to whether defendant was legally insane when he attacked E.L. Defense counsel stated that Dr. Stone was scheduled to complete his evaluation of defendant that afternoon, but the report would not be available until the day before trial. After argument, the trial court denied the motion, finding among other things that defense counsel had not made a diligent effort to obtain Dr. Stone's opinion and that defendant would not be prejudiced because the evaluation would be complete and the report available before the currently scheduled trial date.

---

[1]The office represented another individual on an unrelated case who had requested DNA testing, but the results of that test appeared to exonerate the other individual and implicate defendant in the crime.

¶ 10    Dr. Stone met with defendant after the hearing in order to specifically discuss the circumstances surrounding the attack on E.L. Although this meeting only lasted about 20 minutes, Dr. Stone had previously evaluated defendant's medical records and had met with defendant when he evaluated his fitness for trial. After the meeting, Dr. Stone opined that defendant was insane at the time of the offense.

¶ 11    The morning of the trial, defense counsel filed a motion to appoint a special State's Attorney to prosecute the case. The motion was based on the fact that the lead prosecutor was a complaining witness in the new cases that had been filed against defendant. The prosecutor averred to the trial court that she had no special interest in this case and that the pending charges in the new cases would not have any bearing on how she prosecuted this case. The trial court denied the motion, finding that the prosecutor's continued involvement would neither affect the jury nor prejudice defendant.

¶ 12    At trial, the evidence that defendant had committed the crime was essentially uncontested and the case centered on defendant's affirmative defense of insanity. Dr. Stone testified in defendant's favor, opining that defendant suffered from a host of mental disorders, including bipolar-type schizoaffective disorder, polysubstance dependence, antisocial and borderline personality disorders, viral hepatitis and lead poisoning, and severe psychosocial and environmental problems. Based on Dr. Stone's review of defendant's medical records and his interviews with defendant, Dr. Stone opined that defendant had suffered from either schizophrenia or schizoaffective disorder when he attacked E.L. and was therefore unable to appreciate the criminality of that action at the time.

¶ 13    In rebuttal, the State called Dr. Lourgos. Although Dr. Lourgos agreed that defendant suffered from personality disorders and polysubstance dependence, Dr. Lourgos did not believe defendant suffered from schizophrenia or schizoaffective disorder. Dr. Lourgos conceded that defendant had self-reported some symptoms of these disorders, but in Dr. Lourgos' opinion defendant was most likely malingering. Dr. Lourgos based his opinion on the fact that although defendant claimed that he was hearing voices, he did not present any other symptoms that generally accompany these disorders. In Dr. Lourgos' opinion, defendant was able to appreciate the criminality of his actions when he attacked E.L.

¶ 14    The jury ultimately found defendant guilty but mentally ill, and the trial court sentenced defendant to life in prison. This appeal followed.

¶ 15                                      II. ANALYSIS

¶ 16    Defendant raises four issues on appeal, namely (1) whether the jury's finding of guilty but mentally ill was against the manifest weight of the evidence, (2) whether the trial court erred by denying defendant's motion for a continuance, (3) whether defense counsel was ineffective for failing to obtain an expert opinion on the issue of defendant's sanity until the eve of trial, and (4) whether the trial court erred by denying defendant's motion to appoint a special State's Attorney.

¶ 17                              A. Jury Verdict

¶ 18       The main issue at trial was whether defendant was insane when he assaulted E.L. Under section 6-2(a) of the Criminal Code of 1961 (720 ILCS 5/6-2(a) (West 2010)), "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." Insanity is an affirmative defense (720 ILCS 5/6-4 (West 2010)), and the defendant bears the burden of proving the defense by clear and convincing evidence (720 ILCS 5/6-2(e) (West 2010)).[2] If a defendant proves that he was mentally ill but fails to prove that he could not appreciate the criminality of his actions,[3] then the jury may return a verdict of guilty but mentally ill. See 725 ILCS 5/115-4(j) (West 2010).

¶ 19       In this case, the jury found defendant guilty but mentally ill. On appeal, defendant attacks the jury's finding on the second element of the defense, arguing that he proved by clear and convincing evidence that he could not appreciate the criminality of his actions. Defendant urges us to vacate the jury's verdict and enter a finding of not guilty by reason of insanity.

¶ 20       A defendant's sanity is a question of fact, and we will not overturn the jury's finding unless it is against the manifest weight of the evidence. See *People v. Urdiales*, 225 Ill. 2d 354, 428 (2007); *People v. Johnson*, 146 Ill. 2d 109, 128-29 (1991). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). Under this relatively deferential standard of review, " 'a reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury.' " *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 50 (quoting *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003)).

¶ 21       Reweighing the evidence is precisely what defendant asks us to do on appeal. This case essentially boiled down to the difference in opinion between Drs. Stone and Lourgos about whether defendant could appreciate the criminality of his actions when he attacked E.L. The jury heard conflicting opinions from the two expert witnesses, and based on its verdict the jury chose to accept Dr. Lourgos' opinion over that of Dr. Stone. Defendant argues on appeal that Dr. Stone's opinion should have been given more weight than Dr. Lourgos' because it was better supported. Defendant relies on four specific factors: (1) the interview environment, (2) the use of psychological tests, (3) contemporaneous diagnoses, and (4) defendant's social, physical, and mental history.

¶ 22       Regarding the interview environment, the evidence indicated that defendant was shackled when Dr. Lourgos interviewed him the first time, although it is unclear whether defendant

---

[2]The State retains the burden of proving the elements of the offense beyond a reasonable doubt (720 ILCS 5/6-2(e) (West 2010)), but that is not at issue in this appeal.

[3]It should be noted that although a defendant must prove the elements of the insanity defense by clear and convincing evidence (720 ILCS 5/6-2(e) (West 2010)), the defendant need only prove by a preponderance of the evidence that he suffered from a mental illness in order to be found guilty but mentally ill (720 ILCS 5/115-4(j) (West 2010)).

was shackled during the second interview. Defendant argues that this fact rendered Dr. Lourgos' evaluation of defendant suspect, pointing to testimony by Dr. Stone that it was his experience that meeting with patients unshackled and alone was the best way to ensure an effective interview.

¶ 23 Defendant also points to Dr. Stone's use of psychological tests during his interviews with defendant. Dr. Stone performed two tests, the Test of Memory Malingering (TOMM) and the Minnesota Multiphasic Personality Inventory (MMPI). Based on defendant's performance on the TOMM, Dr. Stone opined that defendant was not malingering, that is, he was not making up his psychotic symptoms. Dr. Lourgos did not perform any psychological tests during his interviews, and in his opinion defendant was falsely reporting that he was hearing voices. When asked about this point during cross-examination, he stated that there was no need to perform either test. Dr. Lourgos explained that the TOMM was designed to test whether a person who claimed not to remember something was in fact having memory problems, and he explained that the MMPI was designed to create a personality profile, not to diagnose mental illnesses. Dr. Lourgos stated that the tests were neither necessary nor helpful in order to determine whether defendant was hearing voices or not.

¶ 24 Defendant also notes that neither Dr. Stone nor Dr. Lourgos evaluated him for sanity until between six and eight years after the attack on E.L. Because of the lapse in time, defendant argues that diagnoses of defendant by other psychiatrists around the time of the attack are crucial evidence regarding his sanity at that time. Only three days after the attack, defendant checked himself into Saint Elizabeth's Hospital for psychiatric treatment. Dr. Stone testified that he reviewed and relied on four particular psychiatric reports on defendant that were written within a month or so of the attack. During this time, defendant was diagnosed with schizophrenia twice, schizoaffective disorder twice, and depression once. Defendant was prescribed various antidepressant and antipsychotic medications, including Haldol, Prozac, Depakote, and Cogentin. Dr. Stone testified that these contemporaneous findings bolstered his opinion that defendant was not sane at the time of the attack.

¶ 25 Dr. Lourgos, however, also reviewed these records and did not find them to be particularly suggestive that defendant was insane at the time. Dr. Lourgos noted that there were numerous notations in defendant's record from other psychiatrists indicating that defendant may have been malingering. Dr. Lourgos also noted that the previous diagnoses of schizophrenia and schizoaffective disorder were for the most part provisional and were based solely on defendant's self report that he heard voices. Dr. Lourgos found it notable that although defendant reported hearing voices, there was no evidence in his medical records that he suffered from any other objective symptoms that normally accompany these disorders. Dr. Lourgos also observed that defendant had been taken off of his medications during 2001-03 in order to determine whether defendant was malingering and defendant appeared to suffer no adverse effects, a fact that Dr. Lourgos found very telling.

¶ 26 Defendant finally points to the two doctors' disparate consideration of defendant's social, physical, and mental history. Both doctors testified that they reviewed ample records that indicated defendant suffered severe physical and emotional abuse as a child, and that he had significant mental health and drug abuse problems beginning at an early age. Dr. Lourgos testified that he did not find this history particularly useful in coming to his diagnosis,

primarily because most of the records describing these issues were not created by mental health professionals and were therefore missing important diagnostic information. Dr. Lourgos conceded that all data is helpful in reaching a diagnosis, but he testified that his own observations and other records were more useful in this case.

¶ 27    The jury heard all of this evidence. The two experts disagreed about which records and facts were helpful and which were not, and they disagreed in their ultimate conclusions on the impact of these records and facts on the question of defendant's sanity. There is nothing in the record, however, that indicates Dr. Lourgos came to his conclusion arbitrarily. Although defendant would have us reweigh the evidence and come to our own conclusion about what weight each expert's opinion should be given, the supreme court has long cautioned that "the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992). It is the jury's place, not ours, "to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony." *Id.* at 452 (citing *People v. Holmes*, 141 Ill. 2d 204, 243 (1990)). Defendant has not brought to our attention any evidence from the record showing that it is clearly evident that defendant could not appreciate the criminality of his actions when he attacked E.L. The jury's verdict of guilty but mentally ill was accordingly not against the manifest weight of the evidence.

¶ 28                                          B. Continuance

¶ 29    Defendant next argues that it was error for the trial court to deny defense counsel's motion for a continuance. At the motion *in limine* hearing that was held four days before defendant's trial was scheduled to begin, defense counsel filed a motion for a continuance. Defense counsel had been reappointed to represent defendant six months before, but she averred that she had just discovered that Dr. Stone had never rendered an opinion on defendant's sanity. Given that defendant intended to present insanity as an affirmative defense, defense counsel stated that she could not adequately represent defendant without additional time to prepare for trial after reviewing Dr. Stone's report. The trial court denied the motion, noting that defense counsel had already had six months in which to obtain a report from Dr. Stone. The trial court also noted that defendant would not be prejudiced since defense counsel would receive the report before trial began, and that there was no need for additional time to prepare because the defense had long since given notice that they intended to present an insanity defense.

¶ 30    The decision whether to grant or deny a request for a continuance is committed to the sound discretion of the trial court. See *People v. Walker*, 232 Ill. 2d 113, 125 (2009). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000). Abuse-of-discretion review is "the most deferential standard of review available with the exception of no review at all." (Internal quotation marks omitted.) *People v. Coleman*, 183 Ill. 2d 366, 387 (1998). In the context of

continuances, reversal is warranted where denial of a continuance "in some manner embarrassed the accused in the preparation of his defense and thereby prejudiced his rights." (Internal quotation marks omitted.) *Walker*, 232 Ill. 2d at 125 (quoting *People v. Lewis*, 165 Ill. 2d 305, 327 (1995)). In *Walker*, the supreme court summarized the appropriate analysis for this situation:

> "Whether there has been an abuse of discretion necessarily depends upon the facts and circumstances in each case [citations], and '[t]here is no mechanical test *** for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend.' [Citation.] Factors a court may consider in determining whether to grant a continuance request by a defendant in a criminal case include the movant's diligence, the defendant's right to a speedy, fair and impartial trial and the interests of justice. [Citations.] Other relevant factors include whether counsel for defendant was unable to prepare for trial because he or she had been held to trial in another cause [citation], *** the complexity of the matter [citation], the seriousness of the charges [citation], as well as docket management, judicial economy and inconvenience to the parties and witnesses [citation]." *Id.* at 125-26.

¶ 31    In this case, the trial court's decision primarily relied on defense counsel's lack of diligence in preparing for trial. Indeed, defense counsel acknowledged during the hearing that she was responsible for ensuring that Dr. Stone completed his evaluation of defendant, but she stated that she had overlooked the fact that he had not done so. Defense counsel offered no reason for this other than that she had assumed that defendant's prior counsel had gotten the full evaluation because the prior counsel had filed an answer asserting insanity as an affirmative defense.

¶ 32    Defendant concedes that the trial court considered appropriate factors before ruling on his motion. This makes this case distinguishable from *Walker*, in which the supreme court reversed the defendant's conviction because the trial court summarily denied a request for a continuance without considering any of the above-mentioned factors. See *id.* at 126-31. Defendant instead argues here that the trial court should have balanced *all* of the factors before deciding whether a continuance was warranted and that the trial court's failure to do so constitutes an abuse of discretion. Defendant cites no authority for this proposition, however, and we are aware of none.

¶ 33    The trial court in this case considered the reasons for defendant's request for the continuance and was well aware of the importance of Dr. Stone's opinion to defendant's overall trial strategy. The trial court was also aware that defense counsel had not been diligent and that the case had been pending for over two years. Perhaps most importantly, the trial court was informed that Dr. Stone intended to complete his evaluation of defendant immediately after the hearing and would be able to provide his report to defense counsel before the trial started. Based on that fact, the trial court noted that defendant would not suffer any prejudice if the trial began as scheduled. Under these circumstances, the trial court did not abuse its discretion by denying defendant's request for a continuance.

¶ 34                                 C. Ineffective Assistance of Counsel

¶ 35        Defendant argues in the alternative that defense counsel was ineffective because she did not discover that Dr. Stone had not evaluated defendant's sanity until nearly the eve of trial. Ineffective assistance of counsel claims are reviewed under the familiar framework articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Manning*, 241 Ill. 2d 319, 326 (2011). In order to receive a new trial under this test, "[a] defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

¶ 36        Regardless of what we may think about defense counsel's failure to obtain Dr. Stone's report earlier than the week before trial, we need not reach that issue because even if we assume that counsel's performance was deficient, defendant was not prejudiced. As the supreme court has explained, "the prejudice prong of *Strickland* is not simply an 'outcome-determinative' test but, rather, may be satisfied if defendant can show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." (Internal quotation marks omitted.) *Id.* at 327 (quoting *People v. Jackson*, 205 Ill. 2d 247, 259 (2001)).

¶ 37        In this case, the sole issue that was contested at trial was whether defendant could appreciate the criminality of his actions when he attacked E.L. Even though Dr. Stone did not complete his evaluation of defendant until just before trial, Dr. Stone had already reviewed all of defendant's medical records and had already interviewed defendant once before for about 2½ hours. The second interview that was conducted just before trial was limited to a discussion of defendant's state of mind on the date of the attack, and it only lasted 20 minutes. During the trial, Dr. Stone described in detail the bases for his opinion that defendant was not sane when he attacked E.L., and his findings during this second interview informed only a small part of his opinion.

¶ 38        Defendant argues that defense counsel's failure to get Dr. Stone's report earlier prevented him from mounting an effective defense, but we cannot see how the result might reasonably have been different had Dr. Stone completed his evaluation earlier. Although defendant asserts that his counsel was unable to prepare for trial because she did not have Dr. Stone's report, this is contradicted by the record. When defense counsel asked the court for a continuance, she noted that she had already reviewed all of the discovery in the case, which consisted of several boxes of evidence. More importantly, the record reveals that defense counsel's direct examination of Dr. Stone at trial was comprehensive and well prepared.

¶ 39        Defendant points out that another attorney on his defense team had a great deal of difficulty getting information about defendant's social and medical history into the record during the cross-examination of Dr. Lourgos. Defendant argues that this same information could have been easily elicited from Dr. Stone on direct examination if the defense team had been allowed more time to prepare. This argument is specious. Although the record reveals that the other defense attorney ran into persistent objections while attempting to elicit information from Dr. Lourgos, this has nothing to do with the delay in getting Dr. Stone's report. First, none of the information that defense counsel sought to elicit from Dr. Lourgos

was the product of Dr. Stone's final 20-minute interview with defendant, so we fail to see how conducting that interview earlier would have changed anything. Second, the record reveals that defense counsel's problems in cross-examination were due to his inability to adequately establish foundations for the documents that he was attempting to discuss with Dr. Lourgos. This is an evidentiary and trial advocacy failure that would not have been remedied by having more time to review Dr. Stone's report. Finally, defense counsel eventually *did* succeed in getting defendant's history before the jury, albeit after the trial court excused the jury and explained to defense counsel how to lay a proper foundation. Given these facts, there is nothing in the cross-examination of Dr. Lourgos that indicates defendant was prejudiced by the failure to obtain Dr. Stone's report earlier.

¶ 40　　One point does give us pause. In both its cross-examination of Dr. Stone and its closing argument, the State questioned Dr. Stone's opinion because he had found defendant to be insane only days before the trial was set to begin. Had defense counsel not waited until the last minute to complete Dr. Stone's evaluation of defendant, the State would not have been able to attack Dr. Stone's credibility with this fact.

¶ 41　　With that said, however, we cannot say that this single point reasonably undermines confidence in the outcome of the trial or rendered it unfair. As we have noted repeatedly, the core factual issue in this case was whether defendant understood the criminality of his conduct at the time of the attack. Even leaving aside the medical and psychological opinions of the two expert witnesses, there was ample testimony from lay witnesses that indicated defendant knew his assault on E.L. was wrong. Evidence was introduced that defendant attacked E.L. in a dark and secluded area, that he attempted to hide her from passersby and tried to keep her quiet during the attack, and that he took other steps to avoid detection. Such actions are inconsistent with the claim that defendant could not appreciate the criminality of his conduct. See, *e.g.*, *People v. McCullum*, 386 Ill. App. 3d 495, 504-05 (2008) (noting that "[e]xpert testimony may be entirely rejected by the trier of fact if he or she concludes a defendant was sane based on factors such as: whether lay testimony is based on observations made shortly before or after the crime; the existence of a plan for the crime; and methods undertaken by the defendant to prevent detection").

¶ 42　　In sum, even if defense counsel was professionally negligent for failing to have Dr. Stone complete his evaluation in a timely manner, there is no indication that her failure "rendered the result of the trial unreliable or the proceeding fundamentally unfair." (Internal quotation marks omitted.) *Manning*, 241 Ill. 2d at 327. Because defendant cannot satisfy the prejudice prong of *Strickland*, he is not entitled to a new trial based on ineffective assistance of counsel.

¶ 43　　　　　　　　D. Appointment of Special State's Attorney

¶ 44　　Defendant's final contention is that the trial court erred by declining to appoint a special prosecutor. On the morning of trial, defendant moved to have a special prosecutor appointed on the ground that the current prosecutor had a special interest in the case because she was a complaining witness against defendant in another case. Defendant based his motion on section 3-9008 of the Counties Code (55 ILCS 5/3-9008 (West 2010)), which authorizes the

trial court to appoint a special prosecutor "[w]henever the State's attorney is sick or absent, or unable to attend, or is interested in any cause or proceeding, civil or criminal, which it is or may be his duty to prosecute or defend."

¶ 45      The parties differ as to whether this statute applies only to the removal of the elected State's Attorney or extends to the removal of the entire office based on the actions of individual assistant State's Attorneys. The State asserts that the statute cannot be used to remove an individual assistant State's Attorney from a case or the entire office due to the alleged interest of a single prosecutor, but defendant clarifies in his reply brief that he seeks the removal of the State's Attorney's office as an alternative remedy to the removal of the individual prosecutor. This issue has been addressed in other cases, if not explicitly, so we will not revisit it here. See, *e.g.*, *People v. Lang*, 346 Ill. App. 3d 677 (2004) (removal of Lake County State's Attorney's office from case due to actions of assistant State's Attorney); *Sommer v. Goetze*, 102 Ill. App. 3d 117 (1981) (removal of Tazewell County State's Attorney's office because an assistant State's Attorney was the complaining witness). Moreover, we need not reach this issue given that the trial court did not abuse its discretion in denying defendant's motion, as we discuss further below.

¶ 46      In general, there are three situations in which a special prosecutor may be appointed: (1) the prosecutor is interested as a private individual in the case, (2) the prosecutor is an actual party to the litigation, or (3) the prosecutor's continued participation in the case creates the appearance of impropriety. See *People v. Bickerstaff*, 403 Ill. App. 3d 347, 352 (2010). The decision of whether to appoint a special prosecutor is within the sound discretion of the trial court. See *id.*

¶ 47      We note in passing that defendant conflates the first and third situations at times in his brief, arguing that there was an appearance of impropriety because the prosecutor had a personal interest in the case. Considering the cases that defendant relies on, however, it is relatively clear that his argument is that this case presents an appearance of impropriety rather than a personal interest. We reiterate that it is important to differentiate between these two kinds of situations because the analytical framework is not the same. Compare *People v. Arrington*, 297 Ill. App. 3d 1, 3 (1998) (test for personal interest), with *Bickerstaff*, 403 Ill. App. 3d at 352 (test for appearance of impropriety).

¶ 48      That said, defendant contends that the prosecutor's participation in this case created an appearance of impropriety because she was a complaining witness in the newly filed cases against defendant. In this type of situation, the proper analysis is to balance "(1) the burden that would be placed on the prosecutor's office if the entire prosecutor's office had to be disqualified; (2) how remote the connection is between the State's Attorney's office and the alleged conflict of interest; and (3) to what extent the public is aware of the alleged conflict of interest." (Internal quotation marks omitted.) *Id.* (quoting *Lang*, 346 Ill. App. 3d at 683).

¶ 49      The trial court considered each of these factors prior to ruling on defendant's motion. In particular, the prosecutor had been assigned to this case for over two years. Given that the trial was set to begin that very day, and the case involved a large amount of expert testimony, medical records, and discovery, appointment of a special prosecutor would have required a significant postponement of the case. Moreover, the connection between this case and the

prosecutor's alleged interest in the new cases against defendant is attenuated at best. Although defendant argued that the allegations that formed the basis of the new cases had been considered by Dr. Stone during his evaluation of defendant and that the prosecutor's name was mentioned in those reports, the trial court found that this connection was unlikely to come before the jury. The prosecutor herself averred that the new cases were wholly irrelevant to this case and that she did not intend to mention the fact that the new cases were pending during defendant's trial. This is also relevant to the final point, given that both the State and the trial court indicated that the allegations in the new cases were highly unlikely to come before the jury, which would prevent the jury from becoming aware of the alleged conflict of interest.

¶ 50    The trial court not only considered all of these points during the hearing on defendant's motion but also considered the relevant case law, particularly *People v. Morley*, 287 Ill. App. 3d 499 (1997). The trial court's ruling on this issue was careful and informed, and we therefore cannot say that it was an abuse of discretion.

¶ 51    To the extent that defendant relies on other cases that have found an abuse of discretion in the decision not to appoint a special prosecutor, these cases are distinguishable on their facts. *Cf. Sommer*, 102 Ill. App. 3d at 120; *Lang*, 346 Ill. App. 3d at 684. In *Sommer*, an assistant State's Attorney was both the complaining witness and the assigned prosecutor in an administrative misconduct case against a sheriff's deputy. See *Sommer*, 102 Ill. App. 3d at 118, 120. In *Lang*, an assistant State's Attorney was the complaining witness in a criminal prosecution against the defendant. See *Lang*, 346 Ill. App. 3d at 678-79, 684. At trial, that same assistant State's Attorney was the key eyewitness in the case against the defendant, and his testimony was elicited by another assistant State's Attorney from the same office. See *id.* at 684.

¶ 52    Unlike both *Sommer* and *Lang*, the prosecutor here was neither the complaining witness nor a necessary witness in the case against defendant for the assault on E.L. Other than defendant's speculative arguments during the motion hearing, there was no indication that the fact that the prosecutor was a complaining witness in an unrelated case against defendant was even relevant to either the State's or defendant's case. Indeed, it was ultimately never referred to at all in front of the jury. As defendant concedes, whether to appoint a special prosecutor is left to the trial court's discretion, and we fail to see how the facts of this case come even remotely close to the improprieties at issue in *Sommer* and *Lang*.

¶ 53                               III. CONCLUSION

¶ 54    For the reasons stated above, the jury's verdict was not against the manifest weight of the evidence, and there were no errors that warrant a new trial. The judgment is therefore affirmed.

¶ 55    Affirmed.