2020 IL App (1st) 171720-U

FOURTH DIVISION
June 30, 2020

No. 1-17-1720

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13 CR 16846 |
| DEANDRE MINOR, | ) ) | |
| Defendant-Appellant, | ) ) | |
| | ) ) ) | Honorable Michael B. McHale, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in denying defendant's motion for a continuance for a fitness examination to determine whether a *bona fide* doubt existed as to his fitness to stand trial where (1) the trial court had already ordered a fitness examination and held a fitness hearing the same day and (2) the trial court found that the motion was a dilatory tactic.

¶ 2    Following a jury trial, defendant Deandre Minor was found guilty of home invasion, residential burglary, attempted first degree murder, and attempted aggravated criminal sexual

assault of the victim, K.C. The trial court sentenced defendant to 30 years' imprisonment for home invasion, consecutive to 30 years' imprisonment for attempted first degree murder, and 12 years' imprisonment for attempted aggravated criminal sexual assault, to be served concurrently with 12 years' imprisonment for residential burglary and consecutively with the other counts. The trial court denied defendant's motion to reconsider sentence. Defendant's sole contention on appeal is that the trial court abused its discretion when it failed to grant him a continuance to obtain an evaluation from a psychologist regarding his fitness to stand trial. While defendant acknowledges that a fitness examination and hearing had been conducted, he maintains that it was inadequate where defendant was exhibiting "suicidal behavior" and the examination lasted only 10 minutes. Accordingly, defendant requests this court reverse the judgment of the trial court and remand for a new trial. As the trial court ordered a fitness examination, conducted a fitness hearing, and determined defendant was fit to stand trial, we affirm the judgment of the circuit court.

¶ 3                                   BACKGROUND

¶ 4      Defendant was charged by indictment for numerous counts of home invasion, residential burglary, attempted aggravated criminal sexual assault, and attempted first degree murder based on the allegations that he unlawfully entered the victim's home on August 9, 2013, and knowingly attempted to commit an act of sexual penetration on the victim while strangling her. Defendant was arraigned and appointed a public defender.

¶ 5      In October 2014, defense counsel requested the trial court order a behavioral clinical examination (BCX) regarding defendant's fitness to stand trial and his sanity at the time of the offense, which the trial court granted. Defendant was examined by Dr. Christofer Cooper, the Chief of Psychology at Forensic Clinical Services, on two separate occasions in November 2014.

Dr. Cooper opined that defendant was fit to stand trial. According to Dr. Cooper, although defendant was "marginally cooperative with the evaluation, he is not manifesting symptoms of a mental condition that would preclude his fitness at the present time." Dr. Cooper found defendant "is aware of the types of charges pending against him and is familiar with the roles of various courtroom personnel" and that "[h]e demonstrates sufficient understanding of the nature and purpose of legal proceedings." Accordingly, Dr. Cooper concluded that he is "capable of rationally assisting counsel in his own defense, if he so chooses; any observations to the contrary should not be viewed as the product of a primary mental illness."

¶ 6　　Dr. Nishad Nadkarni, a supervising psychiatrist at Forensic Clinical Services, also offered an opinion regarding defendant's fitness to stand trial. In a report dated December 2, 2014, Dr. Nadkarni concluded defendant was fit to stand trial based on his review of defendant's medical records and his clinical interview, that defendant "demonstrates an understanding of the charges against him, comprehends the nature of courtroom proceedings, and correctly identifies the roles of various courtroom personnel." In addition, Dr. Nadkarni stated that "defendant demonstrates an adequate capacity to fully assist counsel in his defense and to maintain appropriate courtroom demeanor, if he so chooses." Dr. Nadkarni further stated that, "There is no evidence that the defendant suffers from *bona fide* major mental illness, or cognitive impairment that would preclude him from doing so. Any observations to the contrary should be interpreted as volitional on the part of the defendant, and secondary to marked character pathology." Neither Dr. Cooper nor Dr. Nadkarni were able to fully evaluate defendant for sanity at the time of the offense due to his refusal to cooperate.

¶ 7　　Thereafter, at a December 2014 hearing, defense counsel reported that defendant was found fit to stand trial and as a result did not request a fitness hearing. She did, however,

indicate that she was still pursuing an evaluation regarding defendant's sanity at the time of the offense. In March 2015, defense counsel indicated sanity was no longer an issue and it was not raised again during the course of the proceedings.

¶ 8 Then, in July 2015, defendant requested to proceed *pro se*. The trial court entered and continued the matter for ten days so defendant could consider his request in light of the admonishments previously provided. At the following court date, in August, defendant renewed his request to proceed *pro se*, was admonished accordingly, and the trial court found him to have freely, knowingly, and intelligently made the request. The trial court thus granted the motion and the public defender was granted leave to withdraw.

¶ 9 Defendant represented himself for seven months. On the date the jury trial was originally set to begin, defendant requested the assistance of a public defender and one was appointed to represent him. Thereafter, at a May 2016 court date, the trial court informed defendant that it would conduct the trial even if defendant willingly tried to not come to court. The trial court stated, "Because you have a history of self-inflicted wounds [*sic*]. If you decide to wound yourself before trial or on the day of trial, we are going to have a trial whether you are here or not. Do you understand?" Defendant indicated he understood. In the four court dates which followed, defendant refused to come out of lockup when his case was before the court and defense counsel waived his presence.

¶ 10 On January 23, 2017, the first day of the trial, defendant appeared in court and the trial court made the following record:

> "All right. Mr. Minor is before the bench. This court should reflect that he is not wearing a shirt and he self-inflicted a wound on his right forearm and has apparently placed blood all over his face and chest."

Defendant then introduced himself as "Baby Jesus" and the trial court responded as follows:

> "Mr. Minor has a long history of causing delays from self-inflicted wounds with paperclips, which apparently is what he did again this morning. I believe he has already been evaluated and found fit for trial. He's tried to go *pro se*. He's decided that he wanted a PD. Mr. Minor has a long history of delaying tactics ***.
>
> * * *
>
> Nevertheless, again, this is a delaying tactic. And I'm looking for the fitness findings, too. I don't have any *bona fide* doubt that Mr. Minor has a fitness issue. He knows who the parties are. He's trying to delay this trial."

Defense counsel then requested a fitness evaluation "*instanter*, if necessary." Defense counsel argued that defendant "has inflicted wounds that could be suicidal if he had the proper tools" and thus is not able to assist in his defense. The trial court agreed with defense counsel's suggestion to have defendant's fitness evaluated *instanter*.

¶ 11    In addition to ordering a fitness evaluation, the trial court questioned Officer Smith[1] of the Cook County Sheriff's Department regarding the nature and treatment of defendant's self-inflicted wound. According to Officer Smith, the wound was cleaned, but when officers went to bandage the wound, defendant refused to allow them to bandage him or clean his face. The trial court then asked defendant why he would not allow his face to be cleaned and defendant responded, "Because it's protecting me like that black robe you got on."

¶ 12    Shortly thereafter, the trial court examined Dr. Christofer Cooper, an assistant director of the Department of Forensic Clinical Services for Cook County. Dr. Cooper testified that he has completed approximately 2,000 fitness evaluations and has been qualified as a forensic

---

[1] Officer Smith's first name does not appear in the record.

psychologist between 245 and 250 times in court. After hearing no questions on Dr. Cooper's qualifications, the trial court certified him as an expert in the field of forensic psychology. Dr. Cooper testified he examined defendant that day and on two prior occasions on November 6 and 18, 2014. In November 2014, he found defendant fit to stand trial.

¶ 13    Regarding his current examination of defendant, Dr. Cooper testified that he examined him in the holding cell behind the courtroom. Defendant was responsive, however he refused to offer proper or direct responses to any of the questions posed by Dr. Cooper. Dr. Cooper noted defendant's physical appearance (that blood was smeared on his face) and stated that defendant further opened his wound during the examination by biting it. Defendant then asked the officers to get him treatment for his wound. Dr. Cooper found this behavior to be done in "a goal-directed and purposeful manner."

¶ 14    Dr. Cooper continued that defendant's responses to questions were "highly oppositional and indirect." Dr. Cooper explained that he asked defendant what he was charged with and defendant responded, "going against America" then he spontaneously made comments about being "baby Jesus." After answering a few more questions, Dr. Cooper found defendant's response style to be "goal-directed, intentional, and purposeful" as well as "timed" due to the fact it was on the day his jury trial was set to begin.

¶ 15    When asked by the trial court whether he found any evidence of psychotic or delusional thinking, Dr. Cooper replied that while it was difficult to fully assess his presented mental state, it was his "clinical impression that his responses and behavior were very much goal-directed. There was no indication, in my opinion, of overt and delusional ideation or psychotic symptoms."

¶ 16    Dr. Cooper further noted that many of defendant's responses were consistent with his

observations of defendant during his 2014 examination. According to Dr. Cooper, in 2014, defendant was "similarly oppositional and profane and refused to fully cooperate." When asked about his 2014 findings regarding defendant, Dr. Cooper explained that he had previously found defendant's speech to be "goal-directed and coherent" and he "became increasingly uncooperative." At the second meeting, defendant repeatedly made oppositional and cynical remarks throughout the evaluation and thus his demeanor then was largely consistent with his oppositional demeanor, "although more extreme and dramatic today." Dr. Cooper lastly opined that he found defendant fit to stand trial in 2014 as "there was no indication that he was suffering from a mental illness or a genuine mental illness that would compromise his fitness on either of the two prongs." In regard to his comment about being the baby Jesus, Dr. Cooper testified that he believed it to be malingering or intentional and that it was not the product of mental illness but rather "an intentional or volitional act to try to influence the court proceedings today."

¶ 17    Dr. Cooper opined within a reasonable degree of psychological certainty, "despite the rather atypical and dramatic circumstances, that Mr. Minor is currently fit to stand trial." Dr. Cooper based this opinion on his direct observation of defendant's behavior and on his history of knowing defendant. When asked whether defendant's behavior classified as "volitional" at this time, Dr. Cooper replied in the affirmative. Dr. Cooper further explained that defendant's current behavior (of sitting in court with his shirt on, buttoned, and his face cleaned) was evidence that his behavior was volitional: "That shows that he's currently capable, if he chooses, to behave in an appropriate manner. He's been, for the most part, quiet throughout my testimony to this point. That, to me, demonstrates he has the capacity to behave and comply with courtroom proceedings and rules if he were to choose to do so." Dr. Cooper also testified that defendant was capable of assisting counsel in his defense: "There's nothing that I have seen or

nothing that I've reviewed that would suggest that he suffers from a mental illness that would significantly compromise his capacity to do so if he were to choose to cooperate."

¶ 18    On cross-examination by defense counsel, Dr. Cooper testified that he has not reviewed any of defendant's medical records, did not know how often defendant cuts himself, and was not aware of a head trauma defendant may have suffered in January.  Dr. Cooper explained, however, that defendant's current behavior is not the byproduct of mental illness or injury as he is presently capable of controlling his demeanor.  Dr. Cooper further testified that he examined defendant for 10 minutes and that his evaluation was terminated due to defendant's behavior.  Based on Dr. Cooper's testimony and the trial court's own observations, the trial court denied the motion to continue the trial.

¶ 19    Defense counsel immediately moved for the trial court to reconsider its ruling, arguing that Dr. Cooper's evaluation was insufficient where he only spent 10 minutes with defendant and did not consult any medical records.  Defense counsel renewed its motion to continue the case to allow a more thorough evaluation or, in the alternative, requested the trial court find defendant unfit to proceed.  The trial court found Dr. Cooper's testimony was complete and that his testimony was corroborated by defendant's behavior in the courtroom, *i.e.,* that it was volitional and an attempt to delay the trial.

¶ 20    The matter then proceeded to trial where the following evidence was adduced.  The victim resided in the Gold Coast neighborhood in Chicago on the fourth floor of an apartment building in August 2013.  Her 21-year-old son was residing with her at the time.  On August 8, 2013, at 11:30 p.m. the victim went to sleep in her bedroom.  Later that evening, she awoke and found a muscular man standing in her doorway.  She believed it was one of her son's friends who would stay with her from time-to-time and so she went back to sleep.  Shortly thereafter she

awoke and found the overhead light was on. She looked to the side and found defendant's head next to her hip. He was looking up at her with "no emotion in his eyes." The victim had been sleeping on her stomach and defendant then pushed her shoulder down into the bed. He climbed onto her back and she felt his erect penis rubbing against her buttocks. Defendant then began choking her. The victim could not breathe or scream. Defendant told her "you're just going to go to sleep, and you will not feel a thing" and "you're going to go to sleep and you will not wake up." The victim decided to "play dead" and defendant released his grip from the victim's throat. She was then able to elbow him in the chest and scream. He began choking her again and a struggle ensued. The victim could not recall what occurred thereafter until the police arrived.

¶ 21     The victim's son, who was awakened from his bed upon hearing screams, entered his mother's bedroom and observed defendant, who was wearing only boxer shorts, on his mother's bed with his hands around her throat. Defendant told him "Get out of here. This doesn't concern you." The victim's son left, obtained a knife and a phone, called 911, and locked himself in a bathroom. When he heard his mother scream again, the victim's son attempted to enter the bedroom and a "shoving match" with defendant to open the door ensued. After the victim's son was able to gain access to the room, defendant began collecting his clothing and left the apartment.

¶ 22     Officer Jankowski of the Chicago Police Department testified he was on routine patrol on August 9, 2013, when he responded to the call from the apartment building. At 3:24 a.m. Officer Jankowski found defendant behind the lobby desk of the apartment building wearing no shirt and in the process of pulling up his pants. Officer Jankowski detained defendant who was thereafter identified by the victim and the victim's son as the intruder. The victim's blue blouse was also found balled up inside one of defendant's pant legs. Defendant later admitted that he had

removed money from the victim's purse. In addition, video surveillance footage showed defendant entering the victim's apartment building at 2:55 a.m. According to the victim, the attack occurred at 3:11 a.m. Further photographic evidence and testimonial evidence from a physician demonstrated the victim suffered wounds on her neck consistent with strangulation.

¶ 23    Sergeant Michael Scarriot testified he collected evidence from the victim's apartment including two Gatorade bottles and a bloody black and white men's shirt. Cellular material from under the victim's fingernails was also collected. Defendant, an African American male, submitted to a buccal swab and his DNA was compared to the DNA found on the Gatorade bottles and cellular material. A forensic scientist determined that defendant's partial DNA profile could not be excluded from one of the Gatorade bottles and that one in two trillion African Americans, one in 530 trillion Caucasians, and 1 in 230 trillion Hispanics could have contributed the DNA on the Gatorade bottle. The blood found on the men's shirt was also found to match defendant's DNA profile. Defendant could also not be excluded from being a contributor to the DNA discovered in the cellular material from under the victim's fingernails as only 1 in 120,000 African American men, 1 in 3.5 million Caucasian men, 1 in 580,000 Hispanic men could have contributed that DNA.

¶ 24    The State rested and defendant testified as follows. At 3 a.m. on August 9, 2013, he had gotten into a fight in the area of the 1300 block of North Sedgwick. He then walked down North Avenue toward the Gold Coast area looking for a hotel. He entered the victim's apartment building believing it to be a hotel and took the elevator to the fourth floor. When he got out into the hallway, the victim opened her door and invited defendant inside. According to defendant there were "100 bottles of wine right there" inside the victim's apartment. Defendant picked up a bottle, opened it, and began drinking from it. He then went into the victim's bedroom with the

victim and ingested cocaine. The victim kept talking about her son and when she realized that defendant did not know her son she began "acting crazy." The victim jumped up, so he grabbed her by the throat, pushed her on the bed, and left the apartment.

¶ 25    After hearing closing arguments and jury instructions, the jury found defendant guilty of home invasion, residential burglary, attempted aggravated criminal sexual assault, and attempted first degree murder. Defendant moved for a new trial arguing, in pertinent part, that the trial court abused its discretion when it failed to continue the trial so a fitness examination could be conducted. In denying the motion for a new trial, the trial court took issue with the statements made by counsel in the motion for a new trial. The trial court expressly noted that the record did not comport with counsel's statements and that counsel's statements were exaggerated:

> "First, turning to paragraph five, subsection A, in which the defense indicates that 'Mr. Minor somehow opened up the veins in one of his arms and began bleeding so profusely that the walls were covered in blood.' I myself went into the lockup area to see what had happened after he had been taken out. Yes, there was blood. To characterize them as covered in blood is a ridiculous over-dramatization. There were drops of blood indicating someone had been walking in a path, a trail of blood drops, and in one small area there was a larger, small puddle of blood. And it isn't a mystery to what he did. He didn't somehow open up his arm. He used some sort of metal instrument. And I think it's important to note, because later in the motion here, the next page actually, in subsection C, the defense says that 'The defendant deliberately injured himself in a manner that could have easily been fatal.' There was nothing anything close to fatal by what he did. What he did specifically was, if one would hold out their hand, palm facing down, the forearm area, the upper area of the forearm, he cut into that. Nowhere was it

near the wrist nor any major veins or arteries or anywhere on the neck. Nothing vital about the injury. Which only goes to support the manipulative nature of what he was doing in attempting to delay the trial. But nothing fatal about it, and this is not an accurate depiction as is presented in this motion.

As far as his fitness goes, he created his own history in his record of the attempt to delay the trial. I rely on the expert testimony of Dr. Cooper. I recall he said he had done thousands of evaluations, including *instanter* evaluations, which was the type he did here at trial. He did also have history to rely on, and he noted the appropriate things of his testimony, and I do believe that Mr. Minor was fit and still is."

¶ 26 The matter then proceeded to a sentencing hearing where evidence was presented in aggravation and mitigation. The trial court sentenced defendant to 30 years' imprisonment for home invasion, consecutive to 30 years' imprisonment for attempted first degree murder, and 12 years' imprisonment for attempted aggravated criminal sexual assault, to be served concurrently with 12 years' imprisonment for residential burglary and consecutively with the other counts. The trial court denied defendant's motion to reconsider sentence. This appeal followed.

¶ 27                                    ANALYSIS

¶ 28 On appeal, defendant's sole contention is that the trial court abused its discretion when it denied his motion for a continuance to obtain a fitness evaluation. While defendant acknowledges that a fitness examination and hearing had been conducted, he maintains that it was inadequate where defendant was exhibiting "suicidal behavior" and the examination lasted only 10 minutes. Accordingly, defendant requests this court reverse the judgment of the trial court and remand for a new trial.

¶ 29 In response, the State asserts that the trial court properly denied defendant's motion for a

continuance where the trial court found his request was another attempt to delay trial proceedings and where it confirmed defendant was fit to stand trial.

¶ 30    Section 114-4 of the Code of Criminal Procedure enumerates the grounds for a continuance in criminal proceedings. 725 ILCS 5/114-4 (West 2016). Section 114-4(b)(4) provides that a continuance is proper where the defendant cannot stand trial because of physical or mental incompetency. 725 ILCS 5/114-4(b)(4) (West 2016). All motions for continuance are addressed to the discretion of the trial court. 725 ILCS 5/114-4(e) (West 2016); *People v. Hernandez*, 313 Ill. App. 3d 780, 783 (2000). Before a reviewing court finds that a trial court abused its discretion in denying a continuance, it must appear, in some manner, that the court's refusal hindered the accused in his defense and thereby prejudiced his rights. *People v. Kagan*, 283 Ill. App. 3d 212, 217-18 (1996).

¶ 31    The denial of a continuance is within the sound discretion of the trial court, and we may not disturb its decision in that respect absent a clear abuse of its discretion. *People v. Chapman*, 194 Ill. 2d 186, 241 (2000). In this context, there is no " 'mechanical test' " to determine whether the court's denial of a continuance violated a defendant's substantive right. *People v. Walker*, 232 Ill. 2d 113, 125 (2009) (quoting *People v. Lott*, 66 Ill. 2d 290, 297 (1977)). Rather, a reviewing court may look at different factors. These include the defendant's diligence; his right to a speedy, fair and impartial trial; the interests of justice; counsel's inability to prepare for trial; the history of the case; its complexity; the seriousness of the charges; docket management; judicial economy; and inconvenience to the parties and witnesses. See *Walker*, 232 Ill. 2d at 125-26; *People v. Balfour*, 2015 IL App (1st) 122325, ¶ 48. Ultimately, the determination of whether an abuse of discretion occurred in the trial court's decision to deny a continuance turns on the facts and circumstances of each individual case. See *Lott*, 66 Ill. 2d at 297. We will find

an abuse of discretion only when the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would have taken the court's view. *People v. Banks*, 2016 IL App (1st) 131009, ¶ 70; *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 30 (quoting *Walker*, 232 Ill. 2d at 125 ("[i]n the context of continuances, reversal is warranted where denial of a continuance 'in some manner embarrassed the accused in the preparation of his defense and thereby prejudiced his rights' ")).

¶ 32    In this case, defendant maintains that the trial court abused its discretion in failing to continue the trial for him to obtain another fitness evaluation where his behavior warranted such an evaluation and the fitness evaluation he received was inadequate. Specifically, regarding his behavior, defendant maintains that he exhibited "suicidal behavior" and was acting irrationally where defendant insisted on being present in court "covered in blood" and referred to himself as "baby Jesus." As to the evaluation, defendant asserts it was inadequate because Dr. Cooper examined him for 10 minutes and did not review his medical records.

¶ 33    The due process clause of the fourteenth amendment of the United States Constitution bars the criminal prosecution of a defendant who is not competent to stand trial. U.S. Const., amend. XIV; *Medina v. California,* 505 U.S. 437, 439 (1992); *People v. Mitchell*, 189 Ill. 2d 312, 326 (2000). A defendant is presumed fit to stand trial (725 ILCS 5/104-10 (West 2016)) and is entitled to a fitness hearing "only when a *bona fide* doubt of his fitness to stand trial or be sentenced is raised." *People v. McCallister*, 193 Ill. 2d 63, 110 (2000) (citing *People v. Johnson*, 183 Ill. 2d 176, 193 (1998)). A defendant is unfit "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2000).

¶ 34    There is a *bona fide* doubt as to defendant's fitness when there is a "real, substantial and

legitimate doubt" assessed against an objective standard. *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991). Since "fitness" refers only to an ability to function at trial, and not to competence in other areas (*People v. Easley*, 192 Ill. 2d 307, 320 (2000)), "a mental disturbance or an instance of psychiatric treatment does not necessarily raise a *bona fide* doubt of fitness." *People v. Woodard*, 367 Ill. App. 3d 304, 319 (2006); *Eddmonds*, 143 Ill. 2d at 519. There are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope v. Missouri*, 420 U.S. 162, 180 (1975). A trial court may consider defendant's irrational behavior, demeanor at trial, and any prior medical opinion on the defendant's competence to stand trial. *People v. Harris*, 206 Ill. 2d 293, 304 (2002). A reviewing court must keep in mind that the trial court had "the best opportunity to observe defendant's behavior and assess its level of propriety." *Woodard*, 367 Ill. App. 3d at 320. Accordingly, the question of whether a *bona fide* doubt of fitness exists, like a trial court's determination on a motion to continue, is a fact-specific inquiry (*People v. Tapscott*, 386 Ill. App. 3d 1064, 1077 (2008)) and is a matter within the discretion of the trial court (*People v. Sandham*, 174 Ill. 2d 379, 382 (1996)).

¶ 35     In the case at bar, we cannot say the trial court abused its discretion by failing to continue the trial for an additional fitness hearing. First, it was defense counsel who requested that a fitness evaluation be conducted *instanter*. The doctrine of invited error provides that "a party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). Thus, defendant here

cannot now complain of a procedure that was introduced and accepted by defense counsel. See *id.* ("[Defendant] may not now attack a procedure to which he agreed, even though that acceptance may have been grudging."); *People v. Threatte*, 2017 IL App (2d) 160161, ¶ 18.

¶ 36     Second, the trial court stated that it did not believe a *bona fide* doubt existed as to defendant's fitness, but nonetheless ordered a fitness evaluation and hearing to be conducted. In rendering this determination, the record clearly demonstrates that the trial court considered defendant's behavior and found it not to be as serious as defendant suggests. We observe that our case law provides that, "while an attempted suicide may indicate a possibility of mental disorder, the fact of such an attempt will not always suffice of itself to establish a probability that the defendant is unable to comprehend his position, understand the nature and object of the proceedings against him, or cooperate with his counsel in his own defense." *People v. Heral*, 54 Ill. App. 3d 527, 532 (1977). In ruling on the motion for a new trial, the trial court stated defendant's behavior was not suicidal, noting "There was nothing anything close to fatal by what [defendant] did." The trial court explained, "What he did specifically was, if one would hold out their hand, palm facing down, the forearm area, the upper area of the forearm, he cut into that. Nowhere was it near the wrist nor any major veins or arteries or anywhere on the neck. Nothing vital about the injury." The trial court found that the placement of the wound was further indication that defendant was being manipulative and attempting to delay the trial. As is well-established, the trial court is in the best position to observe the defendant's behavior and assess whether a *bona fide* doubt of fitness exists. See *Woodard*, 367 Ill. App. 3d at 320.

¶ 37     Third, the trial court's determination that defendant was attempting to delay the trial was supported by the record. As noted by the State, discovery was complete in October 2014 and, after numerous months wherein defendant represented himself, in March 2016 on the day set for

the jury trial, defendant requested a public defender be appointed. Then, ten months later, also on the first day of trial, defendant appeared in court with an open wound. Moreover, after defendant was found fit to stand trial in 2014, no further mention was made of his unfitness. The trial court did, however, make mention that defendant should not consider harming himself to delay the trial. In addition, the expert testimony of Dr. Cooper supported the trial court's finding that the motion to continue was a delay tactic. According to Dr. Cooper, defendant's behavior was "goal-directed," "purposeful," "volitional," and "malingering." Dr. Cooper expressly opined that he believed defendant's behavior was timed so as to delay the trial.

¶ 38    Fourth, the trial court had its own opportunity to interact with defendant during the three-and-a-half years his case was pending. During that time, defendant was found fit to stand trial and represented himself for 7 months. While defendant expressed frustration in his inability to have certain resources available to him, in that time he displayed a sufficient understanding of the process in the criminal justice system. As a *pro se* litigant, defendant was able to successfully obtain additional discovery he requested and to obtain an order for access to the law library.

¶ 39    Defendant further argues that the fitness evaluation was inadequate where Dr. Cooper evaluated him for 10 minutes and did not review his medical records. Defendant points out that Dr. Cooper admitted that he could not fully assess defendant's present mental state. Regarding the latter comment, we observe that a "defendant may be competent to participate at trial even though his mind is otherwise unsound." (Internal quotation marks omitted.) *People v. Hanson*, 212 Ill. 2d 212, 224-25 (2004). Dr. Cooper's testimony indicates that he found defendant was competent to stand trial. As noted by the State, Dr. Cooper testified that reading defendant's medical records would not affect his assessment of defendant's present-day fitness. Moreover,

Dr. Cooper testified that his assessment of defendant's diagnosis fitness to stand trial was based on his direct observation of defendant's behavior and his history of knowing him. Dr. Cooper testified that he examined defendant at length twice in November 2014 and his diagnosis of defendant was the same now as it was then. In addition, although the evaluation was 10 minutes long, the record reflects it was a sufficient amount of time for Dr. Cooper to obtain an opinion regarding defendant's fitness where Dr. Cooper testified that "there's nothing that I have seen or nothing that I've reviewed that would suggest that he suffers from a mental illness that would significantly compromise his capacity to do so if he were to choose to cooperate." Indeed, as noted by Dr. Cooper, defendant demonstrated his ability to participate in his defense as reflected by his quiet demeanor during Dr. Cooper's testimony.

¶ 40    We further observe that the trial court was fully aware that defendant had been examined by Dr. Cooper on three separate occasions (twice in November 2014 and once on the day of trial) and also by Dr. Nadkarni in December 2014. After December 2014, no issue was raised about defendant's fitness until January 2017, when the trial was set to proceed. Given the fact that defendant was examined on four separate occasions and the findings of those evaluations were consistent, the trial court did not abuse its discretion in denying defendant a continuance to obtain yet another fitness evaluation.

¶ 41    Finally, we acknowledge that defendant fails to argue in his briefs that any prejudice resulted from the trial court's failure to order a continuance. See *People v. Medina*, 239 Ill. App. 3d 871, 874 (1993) (The party contesting the denial of his motion must establish that the denial resulted in prejudice at trial). "Before we can say that the motion was improperly denied it must appear that the court's refusal in some manner embarrassed the accused in his defense and thereby prejudiced his rights." *People v. La Fiura*, 92 Ill. App. 3d 714, 720 (1981). The record

here demonstrates that defendant was able to participate in his defense. He was able to answer the questions posed to him on direct and cross-examination and he testified consistently with his consent defense. Defendant's behavior was also controlled as he made no verbal outbursts before the jury and inflicted no self-harm during the trial. Accordingly, in the absence of specific evidence demonstrating prejudice, it cannot be said that the trial court abused its discretion in denying defendant's motion. See *People v. Steinmetz*, 287 Ill. App. 3d 1, 6 (1997).

¶ 42                                CONCLUSION

¶ 43    For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 44    Affirmed.