# Illinois Official Reports

## Appellate Court

---

### *People v. Litwhiler*, 2014 IL App (3d) 120431

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KARL R. LITWHILER, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0431 |
| Rule 23 Order filed<br>Motion to publish<br>allowed<br>Opinion filed | May 8, 2014<br><br>June 9, 2014<br>June 9, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly denied defendant's motion to suppress the psilocybin mushrooms discovered in a warrantless search of defendant's vehicle after he was stopped for speeding and a drug dog alerted while walking around the vehicle, notwithstanding defendant's contention that the State failed to establish the reliability of the dog's alert, since the arresting officer testified that he and his dog completed a training program on narcotics detection, he was certified as a drug dog handler and his dog was certified for narcotic and apprehension work and recertified twice a year, the records showed that narcotics were found 66% of the time the dog alerted, and based on the record, there was sufficient evidence of the dog's reliability. |
| Decision Under Review | Appeal from the Circuit Court of Henry County, No. 10-CF-441; the Hon. Ted J. Hamer, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Santiago A. Durango (argued), of State Appellate Defender's Office, of Ottawa, for appellant. |
| | |
| | Terence M. Patton, State's Attorney, of Cambridge (Laura E. DeMichael (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion. Presiding Justice Lytton and Justice Carter concurred in the judgment and opinion. |

## OPINION

¶ 1  The State charged and convicted defendant, Karl Litwhiler, of controlled substance trafficking (720 ILCS 570/401.1 (West 2010)), unlawful possession with intent to deliver a controlled substance (720 ILCS 570/401(a)(11) (West 2010)), and unlawful possession of a controlled substance (720 ILCS 570/402(a)(11) (West 2010)). The circuit court of Henry County sentenced defendant to 12 years' incarceration. Defendant appeals his convictions, claiming the trial court erred in denying his motion to suppress the evidence, as the State failed to provide proper indicia of reliability regarding a drug dog's alert.

¶ 2                                    BACKGROUND

¶ 3  Defendant's conviction stems from a traffic stop during which a police officer found him in possession of 27.46 pounds of psilocybin mushrooms, a controlled substance. The stop occurred on December 11, 2010, on Interstate 80.

¶ 4  At defendant's preliminary hearing, Sergeant Floyd Blanks of the Illinois State Police testified that he was performing stationary radar patrol on Interstate 80 when he observed a white sport utility vehicle (SUV) traveling toward his location at a velocity that appeared to exceed the 65-mile-per-hour speed limit. He activated his radar, which showed the vehicle traveling at 72 miles per hour, so he effectuated a traffic stop.

¶ 5  Blanks noted defendant was driving the vehicle, which was a rental. Defendant's hands began to shake and defendant showed signs of nervousness. Dressed in a suit and tie, defendant explained to Blanks that he was traveling across the country. Blanks observed a large Disney princess box in the cargo area of the SUV.

¶ 6  Blanks stated that minutes later, Trooper Andrew Fratzke arrived with his canine, Viper, and conducted a free-air sniff of the outside of the SUV. Viper alerted; the officers searched the SUV, finding almost 30 pounds of psilocybin mushrooms inside the Disney princess box. The defendant subsequently stated that he agreed to transport 28 pounds of psilocybin mushrooms for $2,500 and also explained that he had a cannabis cigarette in his shoe.

¶ 7  Defendant filed a motion to suppress the evidence obtained at the search, and the matter proceeded to a hearing on defendant's motion. At the hearing, defendant testified that he was

traveling from Portland, Oregon, to New York when he was stopped. He claimed to be traveling at 64 miles per hour at the time of the stop. Knowing he was transporting illegal narcotics, he set his cruise at 64 miles per hour so he would not be stopped for speeding. He was traveling downhill when he spotted Sergeant Blanks' squad car parked in the median. He checked the speedometer and did not notice any fluctuation in his speed. He neither touched his brakes nor altered his speed.

¶ 8    Trooper Fratzke testified that he has been a canine handler for 11 to 12 years. He explained that when a dog is paired with a handler, the two attend a 10-week training session in which the dog is taught apprehension, tracking, and the detection and recognition of different scents and odors of contraband. Viper was trained to identify the odor of marijuana, cocaine, crack cocaine, methamphetamines, and heroin. At the end of the training period, Viper was certified to engage in narcotics and apprehension work. Fratzke was certified as Viper's handler. When asked if he and Viper held "some sort of certification," Fratzke responded, "Yes, we are. We were both–we were both certified. I was certified as a handler, and two times a year Viper was certified as a K-9 to do narcotic and apprehension work."

¶ 9    Fratzke noted Viper's alert method is to scratch the area from which the detected odor emanates, which is an aggressive alert as opposed to a passive alert. Fratzke and Viper conducted two passes around the vehicle. On the first pass, he noticed a change in Viper's breathing and that Viper squared to the vehicle. Fratzke noted that as he was "walking towards the passenger side of the vehicle, he scratched, giving me a positive K-9 alert."

¶ 10    Fratzke stated that he reviewed the video of the stop, which showed that Viper "did scratch on his first pass." Fratzke stated that on the second pass "as he came to the rear of the vehicle again, he sniffed, was sniffing near the rear hatch, squaring his body up to it. At this point he wasn't wanting to leave the rear hatch, staying right there, and then–you know in kind of a frustration type deal for him. You know, he's in the odor, he's not wanting to leave the vehicle, and I'm still walking past him. He started barking at me at this point."

¶ 11    Fratzke testified that as Viper got older, his alert changed to more of a passive alert where he would square up to the odor and stay in the area. Due to deterioration of his spine and rear legs, he would not always scratch. Instead, he would bark and just keep looking at the same spot. Fratzke stated that his "main focus" was always to observe Viper's breathing and look for changes in breathing and body posture. Viper passed away in April of 2011, approximately four months after this stop.

¶ 12    Fratzke claimed that Viper's reliability stayed consistent as he got older, possibly becoming more reliable with age. He was able to follow Viper's keys when an odor was detected through the many years the two worked together. Fratzke did not believe Viper's ability changed, only that Fratzke became more aware of Viper's keys.

¶ 13    Fratzke doubted whether Viper could have alerted on the marijuana in defendant's sock. The defendant sat in Blanks' squad car during the sniff and, given Viper's training in apprehension, Fratzke would not have placed the dog close enough to defendant to alert on the marijuana on defendant's person. After Viper alerted on the vehicle, the officers conducted a search and found the contraband.

¶ 14    Blanks testified that at the time of the stop, his radar unit was properly calibrated, had been tested, and was operating accurately. No other vehicles were in the vicinity of the SUV. The radar indicated that the SUV was traveling 72 miles per hour. The posted speed limit was 65 miles per hour.

¶ 15    The trial court continued the hearing after Blanks' testimony for discovery purposes. When it resumed, Fratzke again testified, noting that his training with Viper took place at the Illinois State Police academy. He reiterated that Viper alerted to the "bumper center tailgate area *** in the region of the rear of the vehicle." He noted canines are not perfect. Normally, he would not ask a driver for consent to search a vehicle when Viper failed to alert to the vehicle, as he had complete faith in Viper. Viper was not trained to detect the odor of psilocybin mushrooms.

¶ 16    Blanks also testified when the hearing continued, stating that the video recording accurately depicted the stop and search. The trial court admitted the recording into evidence without objection. The defendant provided exhibits consisting of documents received from the State regarding Viper's training and performance. These documents indicate that in approximately one-third of Viper's field alerts, law enforcement found no contraband during searches.

¶ 17    Following argument, the trial court found that defendant had properly shifted the burden to the State during the suppression hearing to justify the stop and warrantless search. The State argued that the evidence indicated the stop was justified due to defendant's speeding, that Viper was well trained and certified as a narcotics dog, and that the alert is very clear on the video. Therefore, the State claimed it satisfied its burden of proving a justification for the search and seizure.

¶ 18    Ultimately, the trial court found that the stop was justified as defendant had been speeding. The court continued, finding that Viper went through the 10-week training course, resulting in his certification to detect odors of narcotics. The court found Viper, at the time of the stop, was a reliable canine for the purposes of detecting the odor of the illegal narcotics that he had been trained to detect. The court concluded that Viper's alert provided probable cause to search the SUV and, therefore, denied the motion to suppress.

¶ 19    The matter proceeded to a stipulated bench trial. Defendant did not stipulate to his guilt or the sufficiency of the evidence, only that if called to, the State could produce witnesses who would testify consistent with the testimony described above. The State added facts indicating the contraband had been tested at the Illinois State Police forensic science laboratory in Morton, Illinois. The tests revealed that the contraband was found to be psilocybin, a controlled substance, weighing 13,620 grams or 27.46 pounds.

Defendant renewed his objection to the evidence on the same grounds as his motion to suppress. The trial court then found defendant guilty of all charges. At sentencing, the charges were merged, concluding with the trial court sentencing defendant to 12 years' incarceration on the most serious charge of controlled substance trafficking. The court imposed fines totaling $35,000. The court also allowed defendant to remain free on bond pending appeal. Defendant filed his notice of appeal the same day.

¶ 20                                    ANALYSIS

¶ 21    The sole issue raised on appeal is whether the trial court erred in denying defendant's motion to suppress. Defendant argues that he produced sufficient evidence to bring into question Viper's reliability, thereby shifting the burden to the State to produce evidence that Viper was, in fact, reliable so that Viper's alert could provide officers probable cause to search his vehicle. This burden, defendant claims, the State failed to meet and, as such, the trial court erred in denying his motion to suppress the fruits of the stop.

¶ 22    In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). "Under this standard, a trial court's findings of historical fact should be reviewed only for clear error, and a reviewing court must give due weight to any inferences drawn from those facts by the fact finder." *Id*. "In other words, we give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence." *Id*. However, we review *de novo* the trial court's ultimate legal ruling as to whether suppression was warranted. *Id.*

¶ 23                              A. *Florida v. Harris*

¶ 24    The parties agree that the United States Supreme Court recently articulated the test to be used to determine "if the 'alert' of a drug-detection dog during a traffic stop provides probable cause to search a vehicle" in *Florida v. Harris*, 568 U.S. ___, ___, 133 S. Ct. 1050, 1053 (2013). The *Harris* Court specifically rejected the Florida Supreme Court's requirement that "the State must in every case present an exhaustive set of records, including a log of the dog's performance in the field, to establish the dog's reliability." *Id*. at ___, 133 S. Ct. at 1053. Instead, the *Harris* Court preferred a " 'flexible, common-sense standard' of probable cause." *Id*. at ___, 133 S. Ct. at 1053 (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

¶ 25    The *Harris* Court reiterated long-standing law, which holds that a police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present. *Id*. at ___, 133 S. Ct. at 1055. This test is not reducible to a precise definition or quantification, and finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence have no place in the probable cause decision. *Id*. at ___, 133 S. Ct. at 1055. "All we have required is the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.' " *Id*. at ___, 133 S. Ct. at 1055 (quoting *Gates*, 462 U.S. at 238). To determine whether the State has met this practical standard, courts consistently look to the totality of the circumstances and reject rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible approach. *Id*. at ___, 133 S. Ct. at 1055-56.

¶ 26    With this as a backdrop, the *Harris* Court scolded the Florida Supreme Court for creating a "strict evidentiary checklist, whose every item the State must tick off." *Id*. at ___, 133 S. Ct. at 1056.

¶ 27    The *Harris* Court also discussed the problems inherent in relying on a dog's field performance to determine the dog's accuracy. *Id*. at ___, 133 S. Ct. at 1056. The Court noted that a dog may properly alert to contraband too well hidden for the officers to ultimately find. Or, conversely, the dog may fail to alert where contraband is present. In many cases where the dog does not alert, the officers may not search the car so the false negative is never documented. *Id*. at ___, 133 S. Ct. at 1056-57. Field alerts where narcotics are too well hidden and the described false negatives led the Court to state that the "better measure of a dog's reliability thus comes away from the field, in controlled testing environments." *Id*. at ___, 133 S. Ct. at 1056-57.

> "For that reason, evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert

- 5 -

provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources." *Id.* at ___, 133 S. Ct. at 1057.

¶ 28    After reciting the various training courses the dog in *Harris* had been through, the Court found that the officer "had good cause to view Aldo as a reliable detector of drugs. And no special circumstance here gave [the officer] reason to discount Aldo's usual dependability or distrust his response to [defendant's] truck." *Id.* at ___, 133 S. Ct. at 1059. The Court further noted that defendant failed to question specific aspects "of Aldo's training" at the trial court level and, as such, the arguments were forfeited. *Id.* at ___, 133 S. Ct. at 1058.

¶ 29                                    B. Defendant's Claims

¶ 30    Initially, we must note that defendant asks us to review the video of the traffic stop and conclude that Fratzke "cued" Viper to alert on the vehicle. Defendant failed to make this claim below and, as such, it is forfeited. *Id.* at ___, 133 S. Ct. at 1058-59. During the suppression hearing, the court reviewed the video of the traffic stop, yet defendant made no argument regarding "cuing." Moreover, defendant failed to ask Fratzke any questions related to this new cuing argument. We find the argument forfeited.

¶ 31    As noted above, defendant claims he shifted the burden at the suppression hearing to the State by his testimony that he was not speeding and further by questioning Viper's reliability. While a defendant bears the burden during a motion to suppress of establishing a *prima facie* case that he was doing nothing unusual to justify the intrusion of a warrantless search or seizure (*People v. Linley*, 388 Ill. App. 3d 747, 749 (2009)), if a defendant makes the required showing, the burden shifts to the State to present evidence to justify the search and seizure. *Id.*

¶ 32    The trial court stated below, "Let's get back to the stop. He testified he wasn't speeding, and that was the initial reason for the stop. *** So that in itself would shift the burden since he's testified to it." Sergeant Blanks' testimony disputed defendant's claim that he was not speeding. Blanks testified that he initiated the stop after his radar indicated defendant's vehicle was traveling at 72 miles per hour in a 65-mile-per-hour zone.

¶ 33    Clearly, what weight to ascribe the disputed testimony regarding speeding is within the purview of the trial court, which we will not disturb unless it amounts to clear error. *Luedemann*, 222 Ill. 2d at 542. The trial judge stated that he found Trooper Blanks' testimony credible and "that there was probable cause to stop Mr. Litwhiler's car."

¶ 34    Defendant argued below, and stresses to this court, that he adduced evidence showing Viper was not sufficiently reliable in the area of narcotics detection. As such, defendant claims he made a *prima facie* showing that police were without probable cause to search his vehicle. Defendant continues that since the State failed to produce any evidence regarding Viper's results during controlled narcotics detection exercises, the State failed to meet its burden, and the trial court erred in denying his motion to suppress. We disagree.

¶ 35    Trooper Fratzke testified that he and Viper completed a 10-week training program at the end of which he became a certified handler of Viper, and Viper became certified to "do narcotic and apprehension work." Fratzke stated that Viper's success rate remained constant

throughout the dog's life and, if anything, increased toward the end of the dog's career. Defense counsel asked Trooper Fratzke whether Viper's alert method was changed during the "training, though, that Viper went through throughout his entire career." Fratzke stated it had not been changed. When discussing the certification process, Fratzke noted that "two times a year Viper was certified as a K-9 to do narcotic and apprehension work."

¶ 36    As noted by the *Harris* Court, "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Harris*, 568 U.S. at ___, 133 S. Ct. at 1057. Our supreme court has noted that we "must review the trial court's factual determination that the police dog *** was well trained and sufficiently reliable that his alert gave the police probable cause to search" as any other factual issue and, as such, "the ruling will not be disturbed on appeal unless it is manifestly erroneous." *People v. Caballes*, 221 Ill. 2d 282, 289 (2006).

¶ 37    Defendant does not dispute that the Illinois State Police, the entity which certified Viper and Fratzke, is a bona fide organization. The certification alone allows the court to "presume" (*Harris*, 568 U.S. at ___, 133 S. Ct. at 1056-57) that the dog was sufficiently reliable and protects against any subsequent holding that the trial court's determination of reliability is manifestly erroneous. The State adduced additional evidence, however, from Trooper Fratzke regarding Viper's reliability. Fratzke stated that Viper was certified twice a year, that Viper's reliability remained constant or actually increased as Viper aged, and that his alert method never changed despite the "training" he endured "throughout his entire career."

¶ 38    Defendant acknowledged in his reply brief that Viper's "training records were provided by the Attorney General," yet counsel focused on only Viper's field alert records at the suppression hearing. These records indicated that 66% of the time Viper alerted, narcotics were found. Again, as the Court noted in *Harris*, the mere fact that narcotics were not found the other 33% of the time does not mean that Viper was unreliable, as he could have alerted on residual odors or the narcotics could have been so well concealed as to avoid detection during a search. *Harris*, 568 U.S. at ___, 133 S. Ct. at 1056-57.

¶ 39    Defendant claims neither Fratzke's testimony nor the field alert statistics are sufficient to satisfy the State's burden of proving Viper's reliability. Defendant suggests only the results of controlled tests could possibly have satisfied the State's burden. We disagree.

¶ 40    Defendant's approach is the exact type of "strict evidentiary checklist" which the Florida Supreme Court created, only to be rejected by the *Harris* Court. *Id.* at ___, 133 S. Ct. at 1056. We find the record contains sufficient evidence of Viper's reliability and, as such, the trial court did not err in denying defendant's motion to suppress.

¶ 41                                              CONCLUSION
¶ 42    For the foregoing reasons, the judgment of the circuit court of Henry County is affirmed.

¶ 43    Affirmed.