2015 IL App (1st) 122325

THIRD DIVISION
March 18, 2015
Modified on Denial of Rehearing May 6, 2015


No. 1-12-2325

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF , ILLINOIS | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 09 CR 762 |
| v. | ) ) | |
| WILLIAM BALFOUR, | ) ) | The Honorable Charles P. Burns |
| Defendant-Appellant. | ) ) | Judge, presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Pucinski and Justice Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1    After trial by a Cook County jury, defendant William Balfour was convicted of the first-degree murder of three members of his wife's family, along with charges related to the commission of these murders, including home invasion, aggravated kidnapping, residential burglary and possession of a stolen motor vehicle.  He was sentenced to three consecutive terms

of natural life in prison for the murders and consecutive terms of 60 years, 50 years and 10 years in prison for the related convictions.

¶ 2    Defendant appeals, claiming, in the main, that there was insufficient evidence to convict him of these charges beyond a reasonable doubt while particularly emphasizing his position that the evidence did not conclusively establish that he killed the youngest victim, his wife's seven-year-old son whose body was found days after the home invasion, in a sport's utility vehicle (SUV) stolen from the child's slain uncle.  The vehicle had been abandoned in the vicinity of the west-side apartment where defendant was taken into custody on the day of the murders. Defendant also avers that the search of his person was done without warrant and without probable cause, thus requiring the trial court to have barred any related evidence.  Defendant also claims that the trial was unfair in that the state exaggerated negative forensic evidence as incriminating.  Finally, defendant claims that his sister-in-law's testimony about his unsavory character was irrelevant and prejudicial.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant was married to Julia Hudson, who had a seven-year-old child, Julian King, from an earlier relationship.  At the time of the tragic incidents that are at the center of this appeal, Julia lived in her mother's house at 70th and Yale on Chicago's south side.  She had been, by then, separated from defendant for eight months, during which time they were nonetheless in frequent contact and intermittently intimate.  Her brother, Jason Hudson, then 29, and her mother, Darnell Donerson, lived with Julia and her son in the family home.  Her sister Jennifer Hudson, who was an elementary school classmate of defendant, had moved out of the home some years earlier to pursue a professional artistic career which would prove to be quite successful.

¶ 5    Early on October 24, 2008, just prior to stopping by his wife's home, defendant, who had been "up all night" according to his counsel, asked a friend for help fixing his car's power steering, which was not working. The friend was unable to help at that time, but he used the meeting to buy a "dime bag" of crack cocaine from defendant, who was a dealer of the drug. While they were together, defendant told his customer that he was "dirty" (holding drugs) and that he had a gun on him. Defendant then changed from a hoody sweatshirt into a jacket and went to his wife's home, where he peered into her bedroom window as she was dressing before going to work. She allowed him in the house to talk while she continued to get ready for work. She noted that he smelled of alcohol. Around this time, they had been arguing about the fact that she was seeing somebody during the time of their separation. Defendant was known by many to be very agitated about this recent development, despite the fact that he was intimately involved with several other women during the same period of time.

¶ 6    When Julia left the home, she locked the front door, leaving the three occupants by themselves. As she pulled away from the curb, defendant told her, "I saw your momma this morning." Defendant then lingered in his car near the home for a period of time before later going to a service station to buy power steering fluid for his ailing automobile. Shortly after Julia got to work, she saw a letter informing her about a wage garnishment owing to defendant's failure to pay a car loan in both of their names. This led to a cell phone call and argument. Evidence at trial also revealed that defendant, in the midst of numerous arguments with his wife, had repeatedly threatened to first kill her family and then her if she did not resume their marital relationship. Defendant also told people outside the family that he meant to do harm to his wife and/or members of her family, particularly her brother Jason, who was also a cocaine dealer and the object of considerable scorn from defendant, who openly mocked him because of his weight

(nearly 500 pounds at autopsy). Defendant admitted stealing Jason's gun and was seen in possession of it only days before the murders.

¶ 7 Sometime around 9 a.m., a bullet was fired through the front door of the Hudson home. Inside the home, Julia's mother was shot in the back. She walked farther into the house and was shot again, this time in the chest, landing on the living room floor. In a nearby bedroom, Jason was shot to death, apparently while still asleep. School was closed for some reason on this fall Friday and young Julian was somewhere in the house, padding around in two T-shirts, shorts and shower shoes. Jason's SUV was parked near the home. Around 10 a.m., defendant, dressed again in the hoody, appeared at Abdullah Smith's residence in the same neighborhood. According to Smith, defendant asked, "can you bust a move with me?" Smith declined as he was watching his children. This exchange was witnessed by a mutual friend, Michael Hurst, who said defendant asked Smith for assistance with his car.

¶ 8 About four hours later, Julia returned home, having just received a text message from defendant in which he said he wanted to "get down" with her that night. As Julia approached the front door, she saw the bullet hole, but noted that the door was still locked. She then unlocked the door, walked into the home and saw her mother's dead body on the floor. She ran screaming from the home and enlisted a young neighbor to go in the house to check on her mother, brother and son. The neighbor came out with the news that the young boy was nowhere to be found and that the other two were dead. Julia then called 911 and police descended upon South Yale Street where they soon confirmed that Julian was missing, along with Jason's white SUV.

¶ 9 When asked if there was anybody who might want to harm her family, Julia immediately gave Chicago police department (CPD) officers Bryk and Casey the name of her estranged husband, who had made the aforementioned threats within the prior "week or two." Detective

4

Nolan was given certain information, including defendant's cell phone number, the name of his girlfriend and her address, during the initial investigation. Detective Szudarski was told by a neighbor that he was aware of defendant stalking Julia at or near the house on occasion while also aware that defendant had "made comments that [he] was going to kill everyone in the house." Still other investigating police officers interviewed neighbors who reported hearing gunshots that came from the direction of the Hudson home shortly after 9 a.m. which did not alarm them because it was a relatively common occurrence in the Englewood neighborhood.

¶ 10    During the initial hour of investigation, defendant called Julia, who was then standing with police outside her home, and said that he had been told about the shootings by a young female friend from the neighborhood. He said he was "up north" but was coming right over. Instead, he stayed on the west side at his girlfriend's house. Police would later learn that he spent some of this time trying to get somebody to move his car, which was stranded on the south side, to the west side and trying to create alibis for his whereabouts earlier in the day.

¶ 11    While attempting to identify and locate the perpetrator of the apparent double homicide, CPD also had officers from its special victims unit on the scene, owing to Julian's absence from the family home. CPD Sergeant Washburn determined that defendant's cell carrier was Sprint. He then contacted that provider and asked them to use cell tower data in an effort to locate defendant, after they had issued an Amber Alert. The information provided by Sprint was consistent with "triangulation" that identified a cell tower at 18th and Kedzie, just blocks from the provided address of 1925 South Spaulding.

¶ 12    Later that afternoon, more than a dozen police officers converged on defendant's girlfriend's residence and took him and his girlfriend, Shonta Cathey, into custody for questioning. Defendant attempted to flee and briefly resisted arrest. When taken into custody by

Detective Sanchez, defendant was found to be in possession of his cell phone, some keys and a Chicago Transit Authority (CTA) pass. Defendant and his girlfriend were taken into Area 1 for questioning. Defendant was interviewed on several occasions over a couple hours in which he freely gave his version of his activities for the day. He said he went directly from Diane Grant's home to his wife's residence, neglecting to mention that he took time out to sell some crack. He claimed that in the immediate aftermath of seeing his wife, his car broke down and he went to get power steering fluid. He then claimed to have parked the car around 8:30 near Robeson High School, located several blocks from the Hudson home, and then took the CTA to Cathey's home, using his CTA pass. Evidence at trial would prove much of those claims false. He told police that he got to her home around 10 and that he had been there all day. That was disputed in at least two ways by Cathey. He tried to persuade police that the murders happened because Jason ran a "drug house," while telling police that Jason had enemies, that he had been shot and that the house had been burglarized while defendant was incarcerated a few months earlier. He was instructed to give police the shirt and pants he was wearing and defendant made a point to tell the detectives that he had been wearing those clothes "all day," a statement proved false by testimony and surveillance video at trial.

¶ 13    Cathey was taken to an interrogation room where she initially supplied defendant with his alibi by claiming, at his request, that he had been at her home as early as 10 in the morning, but she eventually told police that he had actually arrived two hours later. She then spoke of his behavior in the hours before being arrested, which included changing items of his clothing while away from her home and his shocking, unsolicited statement that he had killed his mother-in-law and brother-in-law, while denying any knowledge of anything "bad" happening to his stepson, Julian, whom defendant said was "outside" at the time of the killings.

¶ 14    The desperate, citywide search for the missing boy continued.  Three days later, a west side resident, Lynette Williams, called police after seeing a white SUV parked near her home at 13th and Kolin that matched media reports related to the Hudson murders.  She first remembered seeing the car the morning after the murders and her awareness of media reports over the weekend made her think it might be related.  Inside the car, the investigating police could see a child's hand protruding from a shower curtain that covered his body, which lay dead on the floor of the car's backseat area.  Forensic investigation revealed, among other things, a bullet hole through the floorboard suggesting an 80-degree angle of entry through the child's head and then the bottom of the car.  Investigators also determined that the driver's seat was less than two feet from the brake pedal, which was inconsistent with its owner's enormous body habitus, while being entirely consistent with defendant's considerably smaller (5 feet 7 inches, 150 pounds) size.  Helped by 90 probationary officers from the police academy, police conducted a massive foot search of the streets, alleys and yards between the vehicle's location and the apartment where defendant was apprehended, a distance estimated at two miles. Half of the team came from the vehicle's location while the other half came from the apartment.  Each team searched an arm's-width apart.  Just a half-block from the vehicle's location, the search revealed a gun that was identified by numerous witnesses as Jason Hudson's, whose ballistics matched the bullets that killed all three victims.

¶ 15    The prosecution's case was built slowly and steadily over many days of trial before a Cook County jury.  The evidence that inculpated defendant included his admissions to Cathey, along with bountiful circumstantial evidence culled from various witness accounts of threats made by defendant, cell phone records, defendant's CTA pass and various forensic "trace" results obtained by investigators.  Prosecutors also produced testimony of witnesses who said they were

contacted by defendant on the date of the murders and asked to provide him with an alibi or sketchy-sounding assistance of some sort. This circumstantial evidence, which in our view established the defendant's guilt beyond any reasonable doubt, will be further delineated below as an aid in understanding our legal analysis.

¶ 16    The State produced the testimony of a handful of witnesses who testified that they had seen defendant in possession of Jason's Sig Sauer semiautomatic weapon. Others testified of seeing the same gun in defendant's waistband. Still another friend said defendant had the gun during a poker party only days before the murders. Cathey also testified that she had seen defendant with this gun in her apartment on several occasions.

¶ 17    The ballistic evidence was supplied by Caryn Tucker, from the Illinois State Police Forensic Science Center, who testified that the four fired cartridge cases from the Hudson home and the three bullets from autopsies were all fired by that same gun, which was marked as an exhibit and admitted into evidence at trial. Prosecutors produced Robert Berk, a trace analyst also from the State Police, who found gunshot residue on the vehicle's steering wheel cover which he opined was consistent with somebody firing a gun in that environment or somebody who had recently fired a gun and handled the steering wheel cover. Defendant himself was not tested for gunshot residue in a timely fashion, since he was taken into custody too long after the shootings, but Berk did examine various items of his clothing that were worn on the date of the murders, in an effort to find trace particles that might disclose gunshot residue.

¶ 18    In particular, he examined the red Pelle jacket that defendant wore when he arrived back at the Cathey residence for the final time that day and found "one unique particle" on the right cuff that was not consistent with a direct firing in proximity to the jacket but which he opined was consistent with a "secondary or tertiary" transfer onto the jacket. He also examined the tan

jacket that defendant was seen wearing when meeting Julia at the home before the murders. He was only able to identify two of the three necessary "tri-component particles" on the right cuff of the jacket, so he could not definitively say it was positive for gunshot residue, only that it could have come from a "secondary or tertiary transfer." Berk's examination of the back waistband of defendant's pants produced the same result. Finally, Berk examined the interior roof liners from Jason's SUV. This examination of the front roof liner was negative, but his examination of the rear roof liner was positive for gunshot residue, which was consistent with a gun being discharged in the area where Julian's body was found. Notably, several items of clothing that defendant had been seen in during the day, including the hoody and his black athletic pants, were never found and were not tested.

¶ 19    The State called a witness from the CTA who produced records of defendant's CTA pass and determined that it had not been used on the date of this occurrence, despite the fact that defendant told police that he used the pass to take the CTA from the south side around 9 that morning en route to Cathey's apartment on the west side.

¶ 20    The State also produced considerable evidence about cell phone activity. This was first used in an effort to find the missing child in the immediate aftermath of the discovery of the bodies of his uncle and grandmother on South Yale. Several witnesses testified about the ability to track the location of the phone based on "pings" between cell phone towers. The jury heard evidence that two calls were made on October 24, 2008, at 3:30 and 3:32 a.m, using a tower a couple miles from the Hudson home. Phone calls were later made at 7:28, 8:06 and 8:43 a.m., using a tower near the Hudson home. There was no evidence of activity on the phone from that point until 12:56 p.m. at which point the phone was using a tower located near 20th and Western.

All later activity was registered to a tower near Christiana and Ogden, close to Cathey's apartment at 1926 South Spaulding.

¶ 21    Several friends of defendant's testified about phone calls and/or text exchanges in the afternoon hours that defendant had with friends in which either he asked them for help with his ailing automobile or for an alibi. If asked, they were to say that he had been "out west all day."

¶ 22    Julia testified that defendant, on numerous occasions, had threatened to first kill her family and then her if she did not resume their marital relationship. The jury also heard from several witnesses about other, discrete threats made by defendant. For example, Robin Myers' wife Jeannie was a coworker of Julia's. He first met defendant at a party the Myers family hosted for their son's birthday, about two months before the murders. On this occasion, Myers noticed that defendant had a gun in his waistband. Defendant struck up a conversation with Myers. In this brief but chilling encounter, defendant complimented Myers' wife whom he felt was "more caring and nice" than his own wife whom he thought was "cheating on him" with someone from work. He said that if it proved to be true, "I'm fucking her and him up." Defendant continued to rail on about Julia's family, complaining about "the mother and the brother and Jennifer," saying the "fat bitch" (then referring to the mother) did not want him around and the "fat ass" (meaning the brother) claimed defendant was stealing. At least 10 times during this brief conversation, defendant made threats against one or more members of the Hudson family. Defendant had known Myers for all of 10 minutes.

¶ 23    Debra Hampton, a crack cocaine addict and regular customer of defendant's, testified that she was looking to buy crack on a day in August and defendant told her to meet him at the back of the Hudson house, which was but a block from her own home. She noticed him crouched

down near a window, peering into the Hudson home. Her keys made a noise, which irritated defendant, who admitted that he was watching Julia and her new boyfriend in the home.

¶ 24 Remarkably enough, a 13-year-old neighbor of the Hudsons testified that when she first met defendant in a local park, he told her that his wife was cheating on him and that he was going to deal with it. Later, she saw defendant arguing with Julia on the street and overheard defendant say he would kill Julia and her family if she ever called police.

¶ 25 Across town, William Graham, who lived on the same street as Cathey, saw defendant around noon on the day of the murders driving a white SUV, which he parked in a vacant lot, up against a building across from Graham's house, even though there were plenty of spaces down the block, in front of the home where he knew defendant stayed. He told the jury he found this odd, because defendant had never driven that vehicle before and defendant had always parked near where he was staying. He observed defendant get out of the SUV and walk to Cathey's home, liquor bottle in tow. Graham identified Jason's SUV as the car driven by defendant.

¶ 26 Right around 4 p.m., while he was at his girlfriend's house, defendant placed two calls to his friend, Quincy Brown, who was then at his mother's house in a south suburb. According to Brown, defendant routinely referred to his wife as a "fat bitch" who was "cheating on him" and said that he would "kill her" if he caught her. He was also openly contemptuous of her brother Jason, whom defendant regularly called "that bitch-ass nigga [*sic*]." In the first of two phone conversations, Brown described a panicked-sounding defendant who said he was having steering problems with his car. Brown gave him some simple advice, but defendant insisted that Brown meet him at 71st and Vincennes as soon as possible to help out. The call ended, but defendant called back a minute later and again pleaded with Brown to meet him immediately. Brown told him he could not get there for an hour. Then, Brown was put on hold for a couple minutes.

When he returned to the call, defendant told Brown that his wife was on the other line and she was asking why he killed her mother and brother. Brown then asked him why she was blaming him, "out of all people?" Defendant's response: "Because I got into it with that bitch-ass nigga [*sic*]." Continuing the conversation, defendant implored Brown to go to meet a girl named Brittany on the south side who would have the keys for his car and then asked Brown to bring the car out to the west side. Brown had the television on at the time of the second phone call and the news was talking about the murders and the search for defendant. After assuring defendant he was on his way, Brown hung up the phone, but stayed home. About a half-hour later, Brown called defendant and told him that he was all over the news. He told defendant he would pick him up and bring him south so he could check on his family. Brown said he then "boldly" asked if defendant "did it." Defendant responded, "it's bigger than me," and hung up the phone.

¶ 27    The jury also heard from Cathey, who testified that she had been intimately involved with defendant for a number of months, during which time he would sleep at her house four or five nights a week. At first, she was unaware that he was still married, but she later learned that fact and also that he had at least one other girlfriend. Defendant was at her home the day before the murders, which happened to be her daughter's birthday. He left early, saying he would be back, but never returned, claiming he could not get back and that he needed a jack for his car. He said he was over at 83rd and Ellis. Cathey enlisted some help and went to that block in a vain effort to help defendant, who would not answer his phone. She made such a nuisance of herself by repeatedly blowing her horn on the block that police ordered her to leave the area. It was proved at trial that he spent the night with another woman, Diana Grant, but that he nonetheless twice tried to call Julia on his cell phone in the middle of the night.

¶ 28    On the morning of the murders, Cathey and defendant spoke for about 15 minutes and he said he would be coming by her house later. He showed up around noon, carrying a "bottle of Hennessey." He soon left, carrying a pair of blue "Timberland" boots. She coincidentally ran into defendant walking on a sidewalk a couple hours later while she was out shopping and defendant was still dressed in the same outfit as before: a white hoody, black pants and a pair of "Air Jordans." He said he was going to "check on" his car. Unbeknownst to her, his car was still on the south side. An hour later, he came back to her house, but the hoody and sneakers were gone and his outfit then included a red Pelle jacket and the boots that he was carrying earlier. He said he had a headache. Cathey thought he looked upset, so she followed him to the bedroom, where he said if anybody asked, she was to say that he had been there since 10 a.m. He then blurted out, "they got shot." "Who?," she asked. "Her mother and brother," was his chilling reply. As she stared at him, "crazy and bug-eyed," defendant told her that he went in the Hudson house and "the brother rushed him," so defendant shot him, and "the mother was coming down the stairs calling his name," so he shot her. She then asked about the "little boy" and defendant said "he was outside" and assured her that she had "nothing to worry about." She then said, "I hope ain't nothing happen to the little boy," and he repeated that she had nothing to worry about. Defendant then resumed his position on the bed, seemingly glued to his cell phone.

¶ 29    This conversation took place well before Cathey was aware of any reports of the murders and that defendant was being sought. Several hours later, police arrived, prompting defendant to leave her bedroom, phone in hand, "trying to go out the back door." After he briefly attempted to resist, they were both taken into custody. Cathey testified that she lied to police for a number of hours before telling them, in sum and substance, what she testified to in court.

¶ 30     After a three-day deliberation, the jury found defendant guilty of three counts of first-degree murder, as well as home invasion, aggravated kidnapping, residential burglary, and possession of a stolen motor vehicle.  This timely appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32                    A. Warrantless Search of Defendant's Cell Phone Data

¶ 33     Defendant's first contention relates to the warrantless search of his cell phone data, which occurred before he was taken into custody at the Cathey residence.  Before trial, defendant filed a motion to suppress evidence alleging that police searched him without a warrant and without probable cause.  Defendant admits, however, that the motion itself did not address the evidence related to the police efforts to track his cell phone location.  He also admits that he did not object to the evidence at trial or include the issue in his posttrial motion.

¶ 34     In order to address the issue, therefore, defendant argues that his lawyer was ineffective for failing to properly preserve the issue.  To show that counsel was ineffective, a defendant must demonstrate both that counsel's performance was deficient and that, as a result, the defendant was prejudiced.  *People v. Bailey*, 232 Ill. 2d 285, 289 (2009) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).  The failure to satisfy either prong precludes finding that counsel was ineffective.  *People v. Colon*, 225 Ill. 2d 125, 135 (2007).  Thus, the reviewing court is not required to consider whether trial counsel's performance was deficient before examining whether the defendant was prejudiced.  *People v. Perry*, 224 Ill. 2d 312, 342 (2007).  To show prejudice, a defendant must demonstrate a reasonable probability exists that but for counsel's error, the result of proceedings would have been different.  *People v. Harris*, 389 Ill. App. 3d 107, 132 (2009).  The State, meanwhile, argues that counsel's failure to argue and/or preserve this issue is

of no legal moment, because it would not have changed the outcome. This is unquestionably true.

¶ 35    The defendant generally bears the burden of showing that the search and seizure were unlawful, but, warrantless searches are *per se* unreasonable. *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 22. As a result, if the defendant challenges the warrantless search and shows that he was doing nothing unusual, the State has the burden of showing the search was legally justified. *People v. Liekis*, 2012 IL App (2d) 100774, ¶ 20. Specifically, the State must establish that the information relied on was based on sufficient facts to establish probable cause. *Hyland*, 2012 IL App (1st) 110966, ¶ 22. Furthermore, a police officer has probable cause to search where the available facts would warrant a person of reasonable caution to believe that evidence of a crime is present. *People v. Litwhiler*, 2014 IL App (3d) 120431, ¶ 25. In reviewing a trial court's ruling on a motion to suppress evidence, we will reverse the trial court's factual findings only if they are against the manifest weight of the evidence. *Id*. ¶ 22. We review the court's ultimate legal ruling *de novo*. *Id*.

¶ 36    Our review of the hearing on the motion to suppress reveals that the prosecution presented sufficient evidence to establish probable cause to justify the search. The initial investigators on the scene were informed by Julia that defendant had repeatedly threatened to kill her family. Investigators learned that defendant had been in the residence and on the street in front of the home an hour or so before shots were heard coming from the home. They also learned that he was regularly staying with his girlfriend who lived at 1925 South Spaulding. In the immediate aftermath of the discovery of the two bodies, police were in the midst of a search for the seven-year-old boy who, along with his uncle's SUV, was missing from the home. All of these circumstances provided a sufficient basis for establishing probable cause to search

15

defendant. See *People v. Johnson*, 368 Ill. App. 3d 1073, 1082 (2006) (probable cause exists for an arrest when the totality of the facts and circumstances known to the officer is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime). The fact that the police used cell phone technology as an aid in this effort after learning all of the above information does not in any way provide defendant for a legal basis to contest the results of the search of his person that was conducted.

¶ 37    Defendant nonetheless contends that after filing his appellant's brief, the United States Supreme Court held that officers generally must secure a warrant before searching data on a cell phone. *Riley v. California*, _ U.S. _, _, 134 S. Ct. 2473, 2485 (2014). We note that in finding that the search incident to arrest exception did not apply to cell phone data, the Court clarified that the exigent circumstances exception may still apply, such as when a child abductor may have information on his cellphone regarding the child's location. *Id*. at __, 134 S. Ct. at 2494. Even assuming that *Riley* presents a basis for future defense attorneys to challenge the search of cell phone data in circumstances such as those before us, this court has recently declined to hold defense counsel ineffective for failing to predict the Court's future determination in *Riley. People v. Davis*, 2014 IL App (1st) 121040, ¶ 24. We reach the same determination here. Defendant has not shown his entitlement to relief in this instance.

¶ 38                                   B. Forensic Evidence

¶ 39    Defendant next complains that the trial court improperly allowed the State to "misrepresent the testimony of its expert witnesses and claim that negative forensic test results actually were inculpatory." The subject of forensic evidence, or the lack of it, was a consistent theme during the trial, with defendant's capable counsel seeking to characterize the evidence as meager or exculpatory, while the State sought to use the evidence to tie defendant to the crimes.

On appeal, defendant is mostly critical of arguments made by prosecutors about the forensic evidence during closing argument.

¶ 40    It is axiomatic that prosecutors are given wide latitude during closing argument and are allowed to make inferences based on the evidence provided at trial. *People v. Walker*, 262 Ill. App. 3d 796, 804 (1994).   Conversely, it is improper for prosecutors to misrepresent the evidence presented. *People v. Linscott*, 142 Ill. 2d 22, 30-31 (1991).  Furthermore, reversible error only occurs in this regard if remarks are attributable to the "deliberate misconduct" of the prosecutor in a fashion that substantially prejudices defendant. *People v. Burman*, 2013 IL App (2d) 110807, ¶¶ 25, 30-31.

¶ 41    The gunshot residue evidence presented at trial did not conclusively establish that defendant had fired a gun.  The testimony of the trace analyst, Robert Berk, however, did establish that there was gunshot residue on the steering wheel cover of Jason's SUV, which defendant was seen driving several hours after the shootings on Yale.  Furthermore, Berk testified that two items of defendant's clothing contained "unique particles" that were consistent with a secondary or tertiary transfer of gunshot residue onto the clothing.  In closing argument, defendant objected when the prosecutor argued that the secondary or tertiary transfer connected defendant to the crime.  In our view, this argument is a reasonable inference from the evidence, not a misrepresentation.

¶ 42    In a related way, defendant points to the prosecutor's alternative argument that the lack of DNA and fingerprint evidence could still be considered circumstantial evidence of his involvement in the killings.  Stated in a vacuum, this might not make much sense, but the evidence at trial indicated that defendant changed his clothes on a couple occasions on the date of the murders and that some items of clothing were never seen again.  He was wearing a hoody

when observed by the service station camera when he was with his friend who needed to get change for a $20 bill in order to buy a dime bag of crack. He was seen in a tan suede jacket when he was at the Yale residence. Finally, he was later observed to have changed his hoody and his shoes when he was at the Cathey residence. The prosecutor's suggestion that defendant had plenty of time to get rid of much of the forensic evidence, therefore, is clearly a reasonable inference from the evidence presented at trial and did not cause any error or prejudice. See *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶¶ 29-30 (when the State's evidence was substantial, even the prosecutor's alleged improper comment did not cause significant prejudice to the defendant constituting reversible error). The prosecutor was entitled to argue that the absence of conclusive physical evidence was not inconsistent with defendant's guilt, as defendant had suggested. The last contested argument relates to the prosecutor's suggestion that "DNA stands for one thing, do not acquit." In a case in which defendant vigorously argued that the lack of DNA evidence should be considered as reasonable doubt, this transparently cavalier argument can hardly be said to be overly prejudicial to defendant's right to a fair trial.

¶ 43                              C. Testimony of Jennifer Hudson

¶ 44    Defendant vehemently objected to the State's calling of Jennifer Hudson as the first witness at trial. Each party is generally entitled to present evidence that is relevant to its case. *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007). With that said, relevant evidence may be excluded where its probative value is substantially outweighed by potential prejudice. *People v. Pikes*, 2013 IL 115171, ¶ 21. Furthermore, irrelevant evidence is to be excluded. See *People v. Trzeciak*, 2014 IL App (1st) 100259-B, ¶ 91. Decisions regarding the admissibility of evidence will not be reversed absent an abuse of discretion. See *People v. Morgan,* 197 Ill. 2d 404, 455 (2001).

¶ 45     Here, the well-known singer and actress testified that she had known defendant since elementary school when she was his classmate. She told the jury that she did not like defendant and that she repeatedly told her sister to not marry him. The State responds that this evidence was proper because it was part of its evidence to establish defendant's motive to kill his estranged wife's family. We agree. This evidence was corroborated by Julia's coworker's husband, who related threats made to Julia's family, who was said to not want him around. Julia herself also testified that her family did not want defendant around the family home. In addition, Jennifer was called to the witness stand as a "life and death" witness. The State notes that she further testified that she gave her brother Jason the white SUV, a fact that could tend to eliminate the suggestion that he used drug money to pay for the vehicle. In light of the fact that the defense tried to convince the jury that the murders may have been committed by a disgruntled drug customer of Jason's, this testimony was relevant.

¶ 46     Suffice it to say that the fact that Jennifer is a well-known singer and actress does not disqualify her from testifying about relevant issues in a case involving the death of her family members. In addition, any risk of prejudice did not outweigh the probative value of her testimony. There were extensive efforts in *voir dire* to ensure that jurors selected would not be swayed by the fact that Jennifer would testify in open court. It is also worth noting that the defense tried to get a lot of mileage out of this woman's celebrity, using it to develop a theme that investigating officers were desperate to pin the murders on their client, who also invoked Jennifer's name when trying to convince police that he was getting blamed because people were trying to "protect" her name. We find absolutely no error here.

¶ 47                              D. Trial Court's Denial of a Continuance

¶ 48     Defendant next contends that the trial court erred when it denied defendant's motion for a

continuance when the State tendered discovery related to a witness on the eve of trial. It is well settled that the decision of whether to grant or deny a request for a continuance is a matter within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 30. Whether a court has abused its discretion depends upon the facts and circumstances of each case. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). Factors a trial court may consider in determining whether to grant a continuance includes the movant's diligence, the interests of justice, the history of the case, the complexity of the matter, docket management, judicial economy, and inconvenience to the parties. *Id.* at 125-26.

¶ 49    Here, we cannot say that the trial court abused its discretion. During the hearing on defendant's motion for a continuance, defense counsel argued that discovery from the State referencing an Illinois Department of Corrections (IDOC) inmate, named Scott Shanahan, was untimely. The State explained that in April 2011, CPD officers and an assistant State's Attorney interviewed Shanahan after receiving a letter from an informant suggesting Shanahan had information about the case. Shanahan revealed that he had no firsthand knowledge, but received information from his cellmate, later identified as "Mr. Webb," that defendant committed the murders with a Gangster Disciple leader. Webb, however, told investigators that he made the whole thing up. Subsequently, this information was tendered to the defense and defense counsel admitted that they had spoken to Shanahan, who refused to speak to them about the case. Accordingly, defendant knew Shanahan existed. The trial court also determined that a continuance was not warranted because defendant still had ample time to investigate given the trial's prospectively lengthy duration. Thereafter, this issue was revisited during the hearing on defendant's motion for a new trial. Defense counsel had nothing to add when the judge asked if

there was "anything that you found out subsequently regarding these two witnesses that mandates a hearing as to whether or not it was in fact any violation here or whether or not these witnesses were in fact material to the guilt or innocence of your client." Furthermore, defendant fails to offer any argument on how he was prejudiced by the court's denial of the continuance or how any delay in discovery caused him to be ill prepared during the trial proceeding. Accordingly, we find that the trial court did not abuse its discretion in this matter.

¶ 50                                    E. Sufficiency of the Evidence

¶ 51    We now turn to the gravamen of defendant's appeal, which rests upon the alleged insufficiency of the evidence to sustain his convictions. The question for the reviewing court is whether, after viewing the evidence *in the light most favorable to the prosecution*, any rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We will not overturn a criminal conviction on appeal unless the evidence is so improbable or unsatisfactory as to supply reasonable doubt of defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is in the province of the jury to determine the credibility of witnesses and to resolve any conflicts in the testimony. *People v. Sykes*, 341 Ill. App. 3d 950, 983 (2003). We will not substitute our judgment for that of the trier of fact on these matters. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 52    As his counsel did at trial, defendant now references various alleged inconsistencies in witness testimony and perceived gaps in evidence in an effort to persuade us that the State's evidence is simply improbable. As the following analysis will establish, each such contention is meritless. First up is the suggestion that Cathey's testimony about defendant's confession did nothing more than inject reasonable doubt, as it "does not match the evidence" at the scene.

Defendant argues that "Cathey could not provide correct details, because she never spoke to anybody who actually was involved in the shootings." Defendant discounts Cathey's claim that defendant told her he shot Jason after he "rushed" him, because the evidence established he was killed while still asleep in bed. This "inconsistency" is neither a bit prejudicial nor the least surprising, as one can easily conclude that defendant blurted out the murderous events in a manner more acceptable to his paramour, as compared to the State's proof where he shot a grandmother in the back, killed a sleeping man in his bed and then kidnapped and put two bullets in the head of a child as he cowered on the floor of his murdered uncle's stolen car. This argument does not suggest that the State's proof was unsatisfactory or manifestly improbable. See *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 53   As at trial, defendant here seeks to sow reasonable doubt by undermining the credibility of a cocaine-addict witness, Debra Hampton, who testified about threats defendant made against Julia and her family, even though he was her cocaine dealer. In a similar way, defendant would have us focus on the fact that his wife was still intimate with him while they were separated, as if that curious fact would eliminate any possible motive to kill her. Doing so would obviously require us to ignore the many threats that defendant made against the lives of Julia and her family members. This evidence does not support an argument that the State's proof was so improbable or unsatisfactory as to supply reasonable doubt of defendant's guilt. The jury heard and weighed the credibility, of all of the evidence which clearly established beyond any reasonable doubt that this defendant was guilty of all three murders, despite any claimed doubt as to certain links in the evidence. *Id.*

¶ 54   As noted previously, the police testified that when defendant was taken into custody, defendant was in possession of keys, at least one of which was found to fit the vehicle in which

22

Julian was killed. The keys to defendant's own vehicle were not in his possession even though he claimed to have parked the car near Robeson High School before getting on the CTA. At trial, the defense sought to prove that police were involved in some chicanery with Jason's keys in an effort to frame defendant. This effort centered on the fact that the inventory process for the keys did not follow protocol and that the keys were inventoried weeks after defendant was taken into custody. On appeal, defendant claims that the circumstances surrounding collecting, inventorying and forensic testing of the keys provide sufficient doubt to overturn his convictions. We disagree. Even though the police investigative work was less than perfect in some respects, it did not require the jury to dismiss police testimony that defendant had Jason's keys, let alone undermine confidence in defendant's convictions. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006) (the trier of fact is entitled to assess the witnesses' credibility).

¶ 55    Defendant's opening brief before this court expends considerable effort at attempting to create reasonable doubt out of its trial theory that the murders were related to Jason Hudson's activity as a drug dealer. It is quite the understatement that the defense is overstating this aspect of the evidence at trial. The evidence established that Jason lived with his half-brother, Lonnie Simpson, who was a drug dealer in Michigan. Jason later moved back to Chicago. Jurors heard that Jason bought his cocaine in Michigan but sold it in Illinois, so the defendant has dubbed him "a multi-state drug dealer" who "sold what's usually termed weight" that included "kilos and 8-balls," though there was nothing in the way of evidence to support the claims about "weight" and the alleged copious amounts of money that was supposedly routinely stashed at the home. Police did not have to wait long to consider this theory, as it was offered by defendant himself in an interview shortly after he was taken into custody. In that interview, defendant denied any knowledge of the murders or the location of the young boy, while inferring he was put out as a

suspect "because they trying to protect they [*sic*] sister's name" by shifting the focus away from Jason's drug sales activity. Defendant volunteered that Jason "had a lot of enemies," because he was "pushing weight" out of the house. The defense also pointed to evidence that Jason had been shot twice as proof of the existence of people who meant to do him harm. In this statement, defendant offered up his version of his separation from his wife (they had lived together in that very home) with his claim that he "left up out that house," because "it's a drug house." Thus, the defense sought to establish that defendant, himself a drug dealer, left the marital abode of his own accord to avoid the perils of drug dealing. At trial, this theory was used repeatedly in cross-examination and in closing argument, but it does nothing to establish that, when viewed in the light most favorable to the prosecution, a rational jury could not have found the essential elements of the crimes defendant was convicted of committing. The jury heard that theory but clearly rejected it, as it was entitled to do. *Sutherland*, 223 Ill. 2d at 271.

¶ 56     Defendant suggests that the lack of any eyewitness testimony about the killer or killers entering or leaving the Hudson house around the time of the murders means that the State did not prove beyond a reasonable doubt that he was solely responsible for the murders. Defendant also claims that "Jason's stash of drugs, drug paraphernalia, and cash were not discovered by the police when they searched the Hudson home, because they were taken by the killers." Speculation that another person might have committed an offense does not necessarily raise reasonable doubt. *People v. Herrett*, 137 Ill. 2d 195, 206 (1990). These arguments, though factually and legally anorectic, were presented to and rejected by a jury which was evidently more persuaded by the voluminous evidence tying defendant to these crimes. We will not substitute a contrary view of the evidence as defendant requests.

¶ 57    Still, defendant attempts to persuade this court that the State's evidence with respect to Julian's murder is somehow improbable and riddled with doubt.  Defendant argues that, in order for the State's factual theory to hold, he would have needed at least one accomplice to move his own vehicle from the vicinity of the Hudson home.  Defendant argues that the police made him their "only suspect *** not because [he] was guilty of single-handedly committing the offenses, but rather because the police failed to develop any other leads."   Defendant points to testimony about the time of death from the pathologist who performed the child's autopsy, claiming that the testimony would support a finding that the boy was shot and killed *after* defendant was taken into custody.  Defendant claims that the witness  testified that the "very earliest that Julian could have been killed is October 25, 2008."  Bluntly put, the pathologist did not offer that opinion to this jury.  In fact, the witness testified that she was unable to forensically determine the date and hour when Julian died.  She basically opined that the lack of rigor mortis and decomposition were "consistent" with a "time frame of 36 to 72 hours."  Even were we to accept the suggestion that this opinion testimony is arguably inconsistent with the State's timeline of events, it is not something that will be accorded dispositive effect here.  See *People v. Howard*, 376 Ill. App. 3d 322, 329 (2007) ("[i]t is not the role of this court to reevaluate the credibility of witnesses in light of inconsistent testimony and ostensibly retry the defendant on appeal" it is, however, the trier of fact's role to decide whether inconsistencies in testimony irreparably undermined the credibility of the witnesses); *People v. Davis*, 304 Ill. App. 3d 427, 441 (1999) ("it is for the jury to resolve any conflicts in the evidence" and "to decide which testimony to believe and which testimony to discount").  Defendant likewise attempts to discredit the testimony of his girlfriend's neighbor who, several hours after shots were heard on Yale, saw defendant driving the SUV in which Julian was killed, as if he were spinning a yarn to help police.  For further support, defendant

points to the prosecution closing argument in which it was suggested that defendant must have had an accomplice assisting him. To the defense, this means that "this second person shot Julian after learning that [defendant] had been taken into custody." While this is fine fodder for cross-examination of the involved witnesses in an effort to poke holes in the State's theory at trial, it is the jury's job to determine the truth of the facts presented before it. See *People v. Douglas*, 2014 IL App (5th) 120155, ¶ 30 (it is within the province of the jury to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences). Despite the very best efforts of the talented defense counsel at trial, the jury quite simply did not buy these arguments. The jury is not required to accept any possible explanation compatible with defendant's innocence and elevate it to the status of reasonable doubt. *Herrett*, 137 Ill. 2d at 206 (citing *People v. Arndt*, 50 Ill. 2d 390, 396 (1972)). Notwithstanding defendant's suggestions to the contrary, the evidence here was neither improbable nor unsatisfactory and does not in any way create reasonable doubt of defendant's guilt.

¶ 58    Much of the dogged defense effort at trial focused on the lack of conclusive DNA evidence and the absence of definitive gunshot residue evidence as proof of reasonable doubt of his involvement in these murders. Understandably, this was the overarching theme of the spirited defense at trial, but defendant's attempt on appeal to compare his legal plight to that of the defendant in a controversial case where DNA excluded the defendant from guilt is singularly lacking in merit. See *People v. Rivera*, 2011 IL App (2d) 091060.

¶ 59    In *Rivera*, the defendant was tried and convicted in 1993 of raping and killing an 11-year-old girl. *Id.* ¶ 22. He was granted a retrial on appeal and was again convicted in 1998. After his second appeal was denied, the trial court in 2004 granted the defendant's motion for DNA testing of material taken from the vaginal swabs from the decedent. These tests

unequivocally excluded the defendant as the source of the DNA. Despite this evidence, the State decided to retry the defendant. At this trial, there was extensive evidence of the brutality of the crimes committed on the young girl and evidence of a confession that the defendant gave after being picked up by police. In this rambling confession, he admitted to having sex with the child and then killing her when she attacked him with a knife. The State also presented testimony of two "jailhouse snitches" who claimed defendant had confessed to them. The defendant contended that his confession was false, that he was not involved in the attack, that there was no fingerprint or DNA evidence that linked him to the crime and that the DNA evidence collected from the raped and murdered child actually excluded his involvement. *Id.* ¶¶ 4-21. Remarkably enough, the jury nonetheless convicted this demonstrably innocent man. Our colleagues in the Second District reversed the case outright. *Id.* ¶ 41 (*corpus delicti* cannot be proved by the defendant's confession alone and corroborating independent evidence must inspire belief in the confession). The reviewing court found there was absolutely no physical evidence tying the defendant to the scene of the crime, that the vaginal swab excluded defendant and that his confession was not reliable since it was not met with any evidence *aliunde* the confession to prove the offense. *Id.* at ¶ 45 (citing *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004) and *People v. Dalton*, 91 Ill. 2d 22, 29 (1982)).

¶ 60    Simply put, this case bears no factual or legal resemblance to *Rivera*. First, defendant was not pressured into making any statements to Cathey or Brown where he implicated himself. Our review of the police interviews with defendant are simply inconsistent with any undue pressure or psychological tactics that riddled the *Rivera* record. Contrarily, he did not confess to police, he was slyly attempting to divert attention away from himself to distract police. In *Rivera*, apart from defendant's confession and some questionable jailhouse snitches, there was no

evidence tying defendant to the heinous crimes that he was convicted of. In the matter *sub judice*, the State presented evidence *aliunde* establishing that defendant: (1) repeatedly threatened the lives of his wife and her family; (2) was known to have stolen the murder weapon at the end of July and was seen in possession of it only days before the shootings; (3) had an argument with his wife at the scene of the murders and another one while she was at work and he was outside her house shortly before two of the three victims were killed in that house; (4) asked several people to give him an alibi for the time of the murders; (5) was apprehended in an area in which he was seen on the date of the murders driving the vehicle stolen from the scene of two of the murders and which was where the seven-year-old child was killed and secreted for several days; (6) admitted to two of the murders to his girlfriend shortly after they occurred; (7) told a friend on the day of the murders that his wife was blaming him "of all people" for the murders because he "got into it with that bitch-ass nigga [*sic*]," meaning her brother, Jason; (8) was in possession of the keys to the stolen vehicle; (9) gave police a version of his activities on the date of the murder proved false by witness testimony and evidence of his unused transit card; and (10) was unable to establish an alibi for a large chunk of the day of the murders, a period that would have given him time to hide the stolen vehicle, discard the murder weapon and otherwise make it more difficult for investigators to uncover more evidence of his guilt. In addition, nothing of value was stolen from the home itself, indicating a crime of passion, not profit.

¶ 61    While the above-listed facts and inferences are surely not the only ones that could be drawn from the evidence at trial, it is clear that this case is quite the opposite of *Rivera*. This is a case in which the State offered plentiful evidence of this defendant's role in the murders of all three members of his wife's family, an act that unfortunately was cruelly presaged in his many threats. Defendant would have this court focus almost exclusively on the "fact" that the State did

not offer forensic evidence that unequivocally tied him to the murders, as if that were controlling.  It is not. *Wheeler*, 226 Ill. 2d at 120.  Despite these urgent arguments, it is axiomatic that the absence of forensic evidence does not equate to reasonable doubt in all cases.  See *Trzeciak*, 2014 IL App (1st) 100259-B, ¶ 58 (circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged); *Hall*, 194 Ill. 2d at 330 (the trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances as long as all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt).  Accordingly, defendant's argument on the sufficiency of evidence must fail.

¶ 62                                    III. CONCLUSION

¶ 63     Based on the foregoing, we affirm the judgments of the circuit court in all respects.

¶ 64     Affirmed.